THE NORTH CAROLINA STATE BAR v. HARRY DuMONT, ATTORNEY

No. 8010NCSB920

(Filed 19 May 1981)

1. **Attorneys at Law § 11— disciplinary proceeding—applicable statutes**

    In a disciplinary proceeding before the N. C. State Bar where respondent alleged that the proceeding was governed by the amendments to G.S. Ch. 84 which became effective 1 July 1975, respondent could not thereafter challenge the applicability of the 1975 statute to his proceeding; moreover, since the amendments provided that they were to become effective on July 1, 1975 and would "apply to all cases, actions and proceedings arising on and after said date," it was evident that the statutes should apply to all such proceedings begun or instituted after 1 July 1975, even though such proceedings might involve infractions by attorneys of the disciplinary standards of the profession which occurred before 1 July 1975.

2. **Attorneys at Law § 11; Constitutional Law § 33— discipline of attorneys—amendment of statutes—no ex post facto law**

    In a disciplinary proceeding before the N. C. State Bar there was no merit to respondent's argument that application of the procedures contained in the 1975 amendment to G.S. Ch. 84 to his hearing constituted an *ex post facto* application of the law since constitutional prohibitions of *ex post facto* legislation apply only to criminal proceedings, and disciplinary proceedings against attorneys in N. C. are civil and not criminal proceedings.

3. **Attorneys at Law § 11; Constitutional Law § 23.4— procedure for disciplining attorneys—no interference with right to practice law**

    In a disciplinary proceeding before the N. C. State Bar there was no merit to respondent's argument that use of the 1975 amendments to G.S. Ch. 84 unlawfully interfered with his vested right to practice law in N. C., though the practice of law is a property right requiring due process of law before it may be impaired, since the amendments objected to in no way interfered with

1

N. C. State Bar v. DuMont

respondent's right to practice law but only established procedures by which he could be disciplined in the event that he violated standards of professional conduct, and the legislature could properly enact valid retroactive legislation affecting procedure.

**4. Attorneys at Law § 11; Rules of Civil Procedure § 38— disciplinary proceeding—no deprivation of jury trial**

In a disciplinary proceeding before the N. C. State Bar respondent was not unconstitutionally deprived of a trial by jury, since the statutes applicable at the time of respondent's hearing did not provide him with a right to jury trial; moreover, had respondent been entitled to a jury trial, he waived it by failing to make a demand therefor within the time required by the Rules of Civil Procedure. G.S. 1A-1, Rules 38(b), (d) and 39(b).

**5. Attorneys at Law § 11— disciplinary proceeding—fair and impartial hearing**

In a disciplinary proceeding before the N. C. State Bar there was no merit to respondent's contention that he did not receive a fair and impartial hearing because (1) the chairman of the Disciplinary Hearing Commission had knowledge about the actions of respondent, the Commission was charged with whatever knowledge the chairman had about actions of respondent, and with that knowledge the Commission unnecessarily delayed the commencement of these proceedings, since the chairman, of necessity, had to divorce his personal knowledge concerning this proceeding from his position as chairman, which was evidenced by his recusal from participating in the hearing, and there was no imputation of his knowledge to the Commission and no laches on part of the Commission in commencing the proceeding; (2) the Commission consolidated for the purpose of hearing this proceeding with three other proceedings involving respondent, since the record on appeal did not contain any description as to the nature of the other three proceedings and no abuse of discretion was shown; (3) the Commission refused to allow into evidence for non-hearsay purposes only statements made by one of the participants in the proceedings in question, since testimony to the same effect was allowed into evidence without objection; (4) the Commission limited the number of character witnesses respondent could present, since the Commission could properly limit the number of character witnesses and no abuse of discretion was shown; and (5) the Commission permitted respondent to be cross-examined concerning incidents of which he had been acquitted in criminal trials, concerning his marital status and concerning his mental and emotional condition.

**6. Attorneys at Law § 11— disciplinary hearing—standard of proof**

The Disciplinary Hearing Commission of the N. C. State Bar did not err in using the "greater weight of the evidence" rule as the standard of proof in respondent's disciplinary hearing.

**7. Attorneys at Law § 12— disciplinary hearing—procuring of false testimony—sufficiency of evidence**

Evidence was sufficient to support the findings and conclusion of the Disciplinary Hearing Commission of the N. C. State Bar that respondent procured false testimony by a witness during a deposition.

APPEAL by respondent from the Hearing Committee of the Disciplinary Hearing Commission of The North Carolina State Bar (hereinafter Commission). Order entered 9 April 1980. Heard in the Court of Appeals 6 April 1981.

The Commission suspended respondent's law license for a period of six months, after a hearing based upon his procuring false testimony by a witness during a deposition.

The events arose in connection with a civil action pending in Burke County Superior Court, entitled *Jerry Dean Beck, Guardian ad litem of Sharon Sue Beck v. John H. Giles, M.D., Margaret Annis Nygren and Grace Hospital, Incorporated,* together with a companion suit by Beck against the same defendants. The gist of the action was a suit for damages resulting from negligence by defendants in the care and treatment of Sharon Beck while she was a patient in defendant hospital. Plaintiff contended that during a tonsil operation there were problems with the administration of anesthesia to Sharon Beck, causing brain damage to her. The operation was during 1971, and the lawsuit was instituted in 1973.

Evidence presented at the disciplinary hearing tends to show the following:

During the times involved, Michael Kaufman was the chief anesthetist for the hospital and was generally responsible for the anesthesia department. The nub of Beck's claim was negligence by the hospital and the anesthetist, Margaret Nygren, with respect to the anesthesia department itself, the administering of the anesthesia to the patient Beck, and the events occurring thereafter.

Following the incident involving Sharon Beck and another similar occurrence, the hospital requested that Dr. James of Winston-Salem visit the hospital, make a general study of the anesthesia department and standard of anesthesia care at the hospital, and prepare a report of his findings. Dr. James did so, and filed a report dated 7 December 1971 with the hospital. A copy of this report was provided plaintiff's counsel by DuMont prior to the deposition of Kaufman. During October 1972, Kaufman went to Winston-Salem to consult with Dr. James about the specific incidents involving the anesthesia in Grace Hospital. Kaufman provided Dr. James with all the hospital documents and

records in the cases. He wanted Dr. James to provide the hospital with recommendations that would help prevent the reoccurrence of such incidents. In response to this visit, Dr. James sent a letter to Mr. Brothers, the administrator of Grace Hospital at the time, and Kaufman received a copy of the letter from James. This letter, dated 23 October 1972, contained an evaluation of how the cases were handled, including some potential criticism with reference to better monitoring devices on patients and better record keeping.[1] This letter was not produced by DuMont, although request for it had been made. The request erroneously referred to Dr. Dennis James, rather than Dr. Francis James.

---

1. The letter, set out in full, follows:

October 23, 1972

Mr. Grayson Brothers
Administrator
Grace Memorial Hospital
Morganton, North Carolina

Dear Mr. Brothers,

I met with Mr. Michael Kaufman of your anesthesia department for about an hour and fifteen minutes the other day. We discussed two anesthetic deaths with which I am sure you are familiar: Sharon Beck, who had a cardiac arrest during a tonsillectomy in January of 1971 and Dr. Gerald E. Biso, who had a cardiac arrest on September 2nd 1972 at the completion of an operation for hemorroids. In going over the anesthesia records and charts with Mr. Kaufman, I was unable to come up with a specific cause as to why these two patients had suffered cardiac arrests, however, I find it hard to believe that this would have occurred as an act of God and without some kind of mismanagement in the conduction of the anesthetic itself. This is particularly true in the second case where the post-mortum [sic] examination failed to demonstrate any specific changes other than damage secondary to hypoxia. In looking over the records, I would like to make a few comments. The first record from January of 1971 had a number of gaps of information in it consisting of such items as effective pre-medication, pre-operative blood pressure and pulse, the patient's general physical condition, particularly in regards to the cardiac and respiratory systems, medications which the patient may be taking, allergies, and so on. Furthermore, during the course of the anesthetic there is no recording of the flows of nitrous-oxide and oxygen which were used, nor of the percent of halothane which is administered to the patient. At one point, the anesthetist stated that intermittent cyanosis occurred early in the operation but then does not carry through with what was done in order to further assess the patient at this point of time. Anesthetic records, as I am sure you are aware, are essentially legal documents which can be presented in court as evidence. This first record leaves the anesthetist and the hospital with very little to stand on in the way of documenting that the best of patient care was being carried out at the time of this operation, when it comes to techniques in anesthesia and anesthetic management. I cannot

As a part of plaintiff's discovery, a deposition of Michael J. Kaufman was scheduled for Monday, 30 December 1974. Appearing for plaintiff was Harold K. Bennett; Wayne Martin and J.

really criticize the record of the case which occurred this past September and must comment that the form of the record itself is quite superior to that used in the earlier case.

There are a number of things which could have occurred in both of the cases which might explain their sad endings. Certainly poor ventilation with resultant hypoxia and hyper-carbia as a result of laryngospasm or respiratory obstruction which was unrecognized at the end of the second case or a kinked or misplaced endotracheal tube or some similar problem in the first case may have occurred. Although this could be picked up quite easily by an astute anesthetist observing the patient from a clinical standpoint, certainly one must emphasize that early warning of patient difficulty can often be achieved through the use of proper monitoring equipment. In neither case was a pre-cordial stethoscope or an esophageal stethoscope or an electrocardiogram used. At the present time, our hospital monitors virtually every patient during the course of even the simplest anesthetic with an electrocardiogram which is run continuously by means of an oscilloscope and with either a pre-cordial stethoscope or an esophageal stethoscope. These are not terribly expensive items and are well worth the investment for the improvement of patient safety which they provide. Furthermore, I think in this day and age, each operating room should be equipped with a means of continuously monitoring the temperature of patients. Although there was no evidence of malignant hyperpyrexia having occurred in either of these patients, this is a well known phenomenon which can rapidly lead to cardiac arrest and death. The safest and quickest way to diagnose this problem is by monitoring the temperature continuously to detect the rapid rises as they occur. Once again, I feel any modern operating room ought to be equipped with temperature measuring devices and the use of these devices should be routine.

Although in both cases, successful cardiac resuscitation occurred, I feel if the arrests had been diagnosed sooner, it is likely that the brain may have been spared as well. By using the stethoscopes I mentioned above, and the electrocardiogram, the diagnosis might have been made quite a bit earlier. Secondly, after the diagnosis was made, there was some delay in carrying out resuscitation due to the lack of adequate numbers of people in the operating room at the time. A problem which is occurring in many hospitals at the present time is one of having the anesthetist literally deserted at the end of the operation by surgeons and other nursing personnel. If a disaster does occur at this point, the anesthetist is able to perform much less efficiently in resuscitating the patient if help is not available. Therefore, I would urge you to vigorously encourage your surgeons to remain in the operating room until the patient is off the operating table and ready to go to the recovery room. Furthermore, it would be a very useful thing to have a defibrillator in the operating suite itself. Although one can produce effective cardiac output by external massage, this does lead to trauma of the myocardium and can result in a punctured lung or a lacerated liver or spleen from broken ribs. If defibrillation can be carried out earlier and less external massage is necessary, it is to the patient's benefit. Our own operating room suite is equipped with three defibrillators and there is also a defibrillator in our labor and delivery suite, in our X-ray area, and in the emergency room of the hospital. Mr. Kaufman mentioned

Robert Elster represented Dr. Giles; O. E. Starnes, Jr. represented Margaret Nygren; and the respondent, DuMont, represented Grace Hospital.

In late November or early December 1974, Kaufman met with Brothers and DuMont in the hospital. There was a discussion about whether Kaufman recalled the original letter from Dr. James and whether Brothers had sent it back to Dr. James. At the time Brothers received the letter, he was not entirely satisfied with it and said he might return it to Dr. James.

Prior to the taking of Kaufman's deposition, DuMont scheduled a conference with Brothers and Kaufman for the purpose of discussing the deposition. The meeting was held at the hospital on 27 December 1974, and Brothers, Kaufman, Mr. Roye, Miss Houston, and DuMont were present. The conversation was about how they should act as witnesses. DuMont told them to answer

---

that he would also like to have some kind of ventilator in the operating room which could be used during the course of an anesthetic in order to provide the anesthetist with "an extra pair of hands" during some of the more major operations in which he would have to be busy pumping blood, hanging up new bottles of blood, monitoring the patient, writing on the record, measuring central venous pressure, and doing a number of other things which would be difficult to carry out properly if he had to have one hand continuously on the anesthesia bag. Although a ventilator would be most useful and I think you should include it in your plans for anesthesia equipment in the not too distant future, it would rate a poor second in priority, in comparison to the above mentioned items of the stethoscopes, electrocardiogram monitoring equipment, temperature probes and defibrillator.

I enjoyed speaking with Mr. Kaufman and think you have a man who is seriously interested in providing the best of patient care at Grace Memorial Hospital. I commend him on his efforts to try to trace down why these patients arrested and what might have been done to prevent the ultimate outcome of both cases. Finally, I question the wisdom of employing a person to administer anesthesia in this day and age other than a certified, registered nurse anesthetist or Anesthesiologist. I realize that it is not always easy to obtain well trained anesthesia personnel, however, the fact that one of these cardiac arrests occurred when a nurse who was not specifically trained in anesthesia was administering the anesthetic raised rather perplexing questions.

I hope my comments will be of some use to you. I will be happy to discuss any of them with you if you should so desire. Please do not hesitate to call me at Bowman Gray any time you wish to speak with me.

Sincerely yours,

[/s/] FMJ
Francis M. James, III, M.D.

FMJ:vgs

questions briefly and not get harassed, and instructed them as to the general discipline at the deposition. During the course of the meeting, the subject of Dr. James's letter of 23 October 1972 entered the discussion. First, Kaufman was asked to go home and get the letter, which he did not do. Kaufman gave a synopsis of the letter to the others. DuMont explained that Kaufman did not really receive a letter, that it was a copy of a letter, and he could answer "no" if asked whether he received a letter from Dr. James. DuMont said that it was not addressed to him; that the letter requested was from Dr. Dennis James and he had a letter from Dr. Francis James.

Kaufman further testified at respondent's hearing:

Dr. [*sic*] DuMont gave me various reasons why I did not have to answer questions during the deposition concerning the letter from Dr. James to Mr. Brothers. Well, those reasons were that I had not in actuality received the letter. It was a letter to Mr. Brothers. It was not to me. It was not from Dr. Dennis James, who, I believe, was the way the statement read; that the letter was being asked from, from whomever, and then if all of those weren't satisfactory because I—I had to argue the point that that would be difficult; that I didn't have to remember anything; that it's a perfectly legitimate answer to say you don't remember. Once again, I told him that Dr. Giles definitely knew about the letter; that he had read it when I received the copy; that we had discussed it in just the days previous to this meeting; and that he was aware of it; and that he would ask the question—or have the questions asked, to my knowledge of it. And I was concerned about that, even if I could answer those other things, if they asked for a copy, there would be no way that I could deny that I had a copy.

Mr. DuMont advised me that if I were asked during the deposition whether I received a letter from Dr. James that I should say that I did not have the letter because it was not a letter to me and that anything else would be giving information, offering information. Mr. DuMont advised me to answer a question that may be posed "whether I received a copy of a letter from Dr. James?" that once again, I was not required to remember anything with that. I was specifically concerned about the fact that we were talking about it right then. But

now that we had discussed it, answering that I could not remember would be almost an impossibility.

That is correct, Mr. DuMont requested that I go get my copy of the letter. And, yes, that is correct, I refused. I refused because these two incidents were serious things to me and it was the only thing to show that I had taken action to solve that problem because I felt that it would be important to me at a later date to show my action as far as doing something about these two cases. After I refused to get the letter Mr. DuMont requested that I call him at his office. He gave me a phone number and then asked if I would read him the letter and requested that Saturday morning at an early time that I dial this number and read him the letter. Yes, I did do that. I talked with Mr. DuMont for a few moments and he said that he would put me on a tape recorder, that I should read it slowly and precisely and when I was through just hang up the phone. It would automatically disconnect. Yes, sir, I followed those instructions. I read the complete letter.

Directing my attention to Monday morning, December 30, 1974, that was the date that my deposition was to be made. Prior to the taking of my deposition, yes, we met again, the five of us: Mr. Brothers, Mr. Roye, Miss Houston, Mr. DuMont, and myself in the attorney's private office. Again, we made mention that the letter was not that important. He wasn't that concerned about it, but we were to go on with our testimony as decided or talked about on Friday.

In reference to what I said to Mr. DuMont concerning the existence of the letter, I was again very distraught about the fact that I had read him the letter and that he knew the contents and that to be able to say anything other than that I had a letter would not be totally honest, and that Mr. Brothers told him that he didn't tell me how to do anesthesia and that I shouldn't tell Mr. DuMont how to be a lawyer and that I should listen to what he was saying. Again, Mr. Du-Mont stated that I needed to remember that it was not a letter to me; that it was a copy of a letter; it was a letter from a Francis James, not a Dennis James and that if all of those weren't satisfactory, that I needn't remember; that I did not have to recall anything. That was not a requirement.

I argued with Mr. DuMont about my testimony. The deposition then proceeded. Recesses were taken during the taking of the deposition. There were at least two recesses taken during the taking of the deposition during the morning session. During these recesses, what transpired between me and Mr. DuMont or anyone else during these recesses is that we went back to the same office and once again I was told I was either doing well or that they were getting close to focusing on this letter and that I was to remember that it was not necessary that I divulge that this letter was known, or known to exist.

On 2 January 1975, Brothers wrote a letter to DuMont, advising him that he and Kaufman could not sign the deposition because of errors in their answers to questions about the letter from Dr. James. Over the holiday, Brothers had located the original letter.

On 7 May 1975, Kaufman corrected his testimony in the deposition. The original questions, answers, and corrected answers are:

Q. Who is Dr. Francis M. James.

A. He's a—chief of the O.B. anesthesia at the Bowman Gray Hospital.

Q. On what occasion did you discuss the report with him?

A. It was sometime later, a year or better, after another occurrence. I got approval to go down there and show him the charts.

Q. On the Beck case and on the other case?

A. Uh-huh.

Q. As a result of that conference did Dr. James write a letter to the Grace Hospital or to Mr. Brothers or to you?

A. He didn't write any to me.

[CORRECTED ANSWER: I received a copy of a letter written to Mr. Brothers.]

Q. Did you see a letter?

A. Not that I recall.

[CORRECTED ANSWER: Yes.]

Q. Did you hear of him writing a letter?

A. I would have supposed he must have answered, but—

[CORRECTED ANSWER: Yes, I read the letter that Mr. Brothers received.]

. . . .

Q. Was he critical of the resuscitation equipment available at the hospital?

A. I can't say that he was.

[CORRECTED ANSWER: This was in the letter.]

Q. Can you say that he wasn't?

A. Well, no, I can't say that he wasn't, either.

[CORRECTED ANSWER: This was in the letter.]

. . . .

Q. Do you know if he expressed his opinions in the form of a written letter or report?

A. I can't say that.

[CORRECTED ANSWER: Yes, the letter to Mr. Brothers.]

. . . .

Q. And you said you did not receive a response yourself?

A. No, sir.

[CORRECTED ANSWER: I received a copy of the letter to Mr. Brothers.]

. . . .

Q. All right, sir. Now, Mr. Kaufman, I believe you were also questioned about a report that was made by Dr. James to the Grace Hospital. I hand you that document and ask you if that is identically the same document about which you were questioned.

A. (Witness reads document.) I believe so.

[CORRECTED ANSWER: No.]

At the disciplinary hearing respondent testified, and produced other witnesses, including twenty witnesses as to the character and reputation of respondent. Numerous letters to the same effect were received in evidence by the Commission. After giving an extensive review of his outstanding background, DuMont testified concerning the events in question. He denied any meeting between himself, Brothers, and Kaufman in late November or early December 1974. He stated he did set up the pre-deposition conference on 27 December 1974. It was for the purpose of explaining the fundamentals of taking a deposition. He advised them to listen carefully and to be sure they understood the question. The answer should be brief and to the point. There was some discussion about a consultation report dated 7 December 1971. Near the close of the conference, Kaufman took him aside and said he had some information that apparently had not been given to him (DuMont). He asked Kaufman about it and wanted to see it, and Kaufman said he would try to get it to him. The next morning Kaufman called him and said he had a copy of the document he had referred to and began reading it to him. DuMont could not understand it and asked Kaufman to bring it to him before the deposition on Monday. Kaufman promised to do so. On Monday, before the deposition, Kaufman handed him a document which was an unsigned carbon copy, and DuMont said, "Mr. Kaufman, I don't want to see it. Hand it to Mr. Brothers." DuMont glanced at the paper, did not read it, and handed it to Brothers. Brothers said he had never seen the paper before, that James was only employed to make the consultation report. Because of this statement, DuMont did not read the letter. He did not give any instructions with respect to the letter, but repeated his usual instructions concerning depositions. He did not suggest or imply that Kaufman or Brothers should tell a falsehood or otherwise conceal anything or mislead the questioner. He told them to tell the truth, not to guess if they did not know the answer, and not to volunteer any information other than that asked.

Thomas M. Starnes, general counsel for the hospital, was called by respondent as a witness. He testified as follows concerning the letter of Dr. James dated 23 October 1972:

Yes, it is my testimony that when I learned of this letter from Dr. James I reiterated my previously made demands upon Mr. DuMont, as counsel for the carrier, to enter into settlement negotiations. As to whether it is my opinion that this letter was very critical as relates to the Beck case, I suppose the way to characterize my sentiment with respect to it is to refer to my letter to Mr. DuMont dated January 15, 1975.

A. The second paragraph, "It now appears that the liability exposure is even greater than we had originally perceived. By letter of January 2, 1975, Mr. J. Grayson Brothers, Administrator of Grace Hospital, Inc., provided you with the report letter of Dr. Francis M. James, III, concerning his evaluation of the records and conditions relating to the Beck incident.

"Upon the basis of the information set forth in that report letter, a further copy of which is attached hereto, we are now of the very firm opinion that every effort must be made to settle this claim within the limits of the liability coverage and to formally demand on behalf of Grace Hospital, Inc., that appropriate and immediate action be taken to accomplish that purpose."

Yes, there's no doubt in my mind that the letter was damaging to Grace Hospital, particularly as it related to and through Mrs. Nygren who was a named party.

By letter dated 27 March 1975, DuMont wrote Starnes the following:

In addition, as you have doubtless been advised, I did not receive a copy of Dr. James' letter of October 23, 1972, until when the same was attached to a letter from Mr. Brothers, although I have specifically made inquiry regarding the same prior thereto, and was advised by Mr. Brothers that he did not recall any such letter having been received.

After further negotiations, the two Beck lawsuits were settled by consent judgment on 26 January 1976.

At the completion of the hearing, the Commission filed a written order on 9 April 1980, finding facts, making conclusions of law, and ordering that the respondent, DuMont, be suspended from the practice of law in the state of North Carolina for a peri-

od of six months. Upon the announcement of the decision of the Commission, respondent immediately gave notice of appeal in the open hearing. Upon the filing of the written order by the Commission on 9 April 1980, written appeal entries were entered, being dated and filed on 9 April 1980. Thereafter, respondent entered another notice of appeal and objections and exceptions on 14 May 1980. By virtue of N.C.G.S. 84-28(h), the suspension ordered by the Commission was stayed pending determination of this appeal.

*Harold D. Coley, Jr., General Counsel, and A. R. Edmonson for appellee.*

*Adams, Kleemeier, Hagan, Hannah & Fouts, by Charles T. Hagan, Jr. and John P. Daniel, for appellant.*

MARTIN, (Harry C.), Judge.

At the outset, we note that the order appealed in this case was dated and filed by the Commission on 9 April 1980. Respondent gave immediate notice of appeal, both in the open hearing and in writing. Appeal entries were dated and filed 9 April 1980. On 14 May 1980, he again purported to give written notice of appeal. After having given notice of appeal in open hearing and appeal entries having been entered, respondent cannot thereafter extend the time for filing the record on appeal by giving another notice of appeal, albeit in compliance with Rule 18(d) of the North Carolina Rules of Appellate Procedure. *See* Rule 3, N.C.R. App. Proc., and Drafting Committee Note thereto; N.C. Gen. Stat. 1A-1, Rule 58. This appeal was filed with this Court on 29 September 1980, twenty-three days beyond the maximum of 150 days for filing appeals. *See* Rule 12(a), N.C.R. App. Proc. No order by this Court extending time for filing beyond 150 days is contained in the record on appeal. It thus appears from the record on appeal, stipulated to and agreed upon as the record on appeal by respondent's counsel, that this appeal should be dismissed. Rule 12(a), N.C.R. App. Proc.; *Pruitt v. Wood*, 199 N.C. 788, 156 S.E. 126 (1930); *State v. Brown*, 42 N.C. App. 724, 257 S.E. 2d 668 (1979), *disc. rev. denied*, 299 N.C. 123 (1980). Nevertheless, an examination of the records of the clerk of this Court, of which we take judicial notice, discloses an order entered 31 July 1980, extending time to file record on appeal beyond 150 days. Appellant failed to include this order in the record on appeal. This is a violation of

App. R. 9(b) (1) (ix). We, nevertheless, dispose of this appeal upon its merits.

## I.

[1]  Respondent first urges that the Commission never obtained jurisdiction over the person of DuMont or over the subject matter of the proceeding. We recognize respondent's argument that as the events in question occurred prior to 1 July 1975, the effective date of the 1975 amendments to Chapter 84 of the General Statutes of North Carolina, his proceeding should be controlled and governed by N.C.G.S. 84-28 as it existed prior to the passage of Chapter 582 of the 1975 Session Laws. Respondent, however, has judicially alleged that this proceeding is governed by the amendments effective 1 July 1975. In his reply to the Commission's motion to consolidate, he alleged "case number 78 DHC 17 is governed by the provisions of Chapter 84 of the General Statutes of North Carolina in effect after 1 July 1975." A party is bound by an allegation contained in his own pleading and may not thereafter take a position contrary thereto. *Watson v. Clutts*, 262 N.C. 153, 136 S.E. 2d 617 (1964); *Davis v. Rigsby*, 261 N.C. 684, 136 S.E. 2d 33 (1964). Respondent cannot now challenge the applicability of the 1975 statute to this proceeding.

Regardless of the foregoing, we hold that the 1975 amendments were appropriately applied to this proceeding. Respondent relies upon the language of Section 13 of the Act: "This act shall become effective on July 1, 1975, and shall apply to all cases, actions and proceedings arising on and after said date." This reliance is misplaced. Had the legislature intended that the 1975 act be limited to *causes* that arose after 1 July 1975, it would have used such words as "claims," "causes" or "causes of action." Rather, it employed the words "cases, actions and proceedings," evidencing the intent that the act apply to all such lawsuits begun or instituted after 1 July 1975. "Arising," as respondent notes, means beginning, originating or commencing. Thus, it appears that the legislature intended that the act apply to disciplinary hearings commenced after 1 July 1975. It can be assumed that the General Assembly realized that proceedings regarding infractions by attorneys of the disciplinary standards of the profession are not barred by any statute of limitations, and intended that such violations occurring before 1 July 1975 would be addressed in ac-

tions, cases or proceedings instituted under the amendments.

This reasoning is supported by the amendments to the Rules and Regulations of The North Carolina State Bar adopted and approved as reported in 288 N.C. 743. There, at page 772, we find:

> BE IT FURTHER RESOLVED that these amendments shall become effective upon their approval by the Supreme Court in accordance with Section 84-21 of the General Statutes of North Carolina and shall apply to any grievance pertaining to cases, actions or proceedings received in the office of the Secretary-Treasurer on or after that date.

The Chief Justice stated: "[I]t is my opinion that the same are not inconsistent with Article 4, Chapter 84, of the General Statutes." *Id.* at 773.

[2] Respondent's argument that application of the procedures contained in the 1975 amendment to his hearing constitutes an *ex post facto* application of the law is without merit. Constitutional prohibitions of *ex post facto* legislation apply only to criminal proceedings. *Mazda Motors v. Southwestern Motors*, 36 N.C. App. 1, 243 S.E. 2d 793 (1978), *rev'd in part on other grounds*, 296 N.C. 357, 250 S.E. 2d 250 (1979). *See generally* 3 Strong's N.C. Index 3d Constitutional Law § 33 (1976); 16A C.J.S. Constitutional Law § 437 (1956). Disciplinary proceedings against attorneys in North Carolina are civil proceedings, not criminal. *In re Burton*, 257 N.C. 534, 126 S.E. 2d 581 (1962); *In re Bonding Co.*, 16 N.C. App. 272, 192 S.E. 2d 33, *cert. denied*, 282 N.C. 426 (1972). The doctrine of *ex post facto* laws does not apply to attorney disciplinary proceedings. *In re Brown*, 157 W.Va. 1, 197 S.E. 2d 814 (1973); *Braverman v. Bar Association of Baltimore City*, 209 Md. 328, 121 A. 2d 473, *cert. denied*, 352 U.S. 830, 1 L.Ed. 2d 51 (1956); 16A C.J.S. Constitutional Law § 437 at 146 n. 14 (1956).

[3] DuMont further argues that use of the 1975 amendments unlawfully interferes with his vested right to practice law in North Carolina. It is granted that the practice of law is a property right requiring due process of law before it may be impaired. *In re Burton, supra; In re Bonding Co., supra.* Here, however, the amendments in no way interfere with DuMont's right to practice law. They only establish procedures by which he may be disciplined in the event that he violates the standards of professional conduct. Without some wrongful action on the part of an attorney, the

amendments (or the old statute) in no way interfere with an attorney's right to practice law. While the legislature may not destroy or interfere with vested rights, it may enact valid retroactive legislation affecting procedure. *Spencer v. Motor Co.,* 236 N.C. 239, 72 S.E. 2d 598 (1952); *Byrd v. Johnson,* 220 N.C. 184, 16 S.E. 2d 843 (1941). There is no vested right in procedure. We find no merit in respondent's contentions that the Commission lacked personal jurisdiction over DuMont, or that there was a lack of subject matter jurisdiction.

## II.

[4]   Respondent further contends that by the use of the 1975 amendments he was deprived of a jury trial. Under former N.C. G.S. 84-28 the Council of The North Carolina State Bar was to make provision by rules for an attorney to demand trial by jury in the superior court. N.C. Gen. Stat. 84-28(3) (d) (1) (amended 1975). Our Court has held that under this statute an attorney had a right to a jury trial in disciplinary proceedings. *In re Bonding Co., supra.* If this proceeding had been held prior to 1 July 1975, respondent would have been entitled to demand a jury trial. "It is almost universally held that in the absence of a statute so providing, procedural due process does not require that an attorney have a jury trial in a disciplinary or disbarment proceeding." *Id.* at 277, 192 S.E. 2d at 36. Very few states provide a jury trial in disbarment proceedings. 14 N.C.L. Rev. 374 (1936). As found in Ex Parte Wall, 107 U.S. 265, 289, 27 L.Ed. 552, 562 (1883), "it is a mistaken idea that due process of law requires a plenary suit and a trial by jury, in all cases where property or personal rights are involved." At the time of respondent's hearing, he had no right to jury trial. Due process of law was provided him by the procedure established by the 1975 amendments.

> The question, what constitutes due process of law within the meaning of the Constitution, was much considered by this court in the case of *Davidson v. New Orleans,* 96 U.S., 97 [XXIV., 616]; and *Mr. Justice* Miller, speaking for the court, said: "It is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the State, a fair trial in a court of justice, according to the modes of proceeding applicable to such a case."

107 U.S. at 289-90, 27 L.Ed. at 562.

Had attorney DuMont been entitled to a jury trial, the record indicates that he waived it. His answer was filed 2 October 1978, without a demand for jury trial. Thereafter, notice of hearing before the Commission, dated 29 September 1978, was filed. On 2 November 1978, respondent filed motion for trial by jury. He did not request that the cause be transferred to the superior court for trial at regular term. Rule 38(b) of the North Carolina Rules of Civil Procedure requires that request for jury trial be made within ten days after the service of the last pleading directed to issues triable of right by jury. N.C. Gen. Stat. 1A-1, Rule 38(b). The last such pleading was respondent's answer, filed 2 October 1978. Ten days from that date respondent was precluded from demanding a jury trial. *Schoolfield v. Collins*, 281 N.C. 604, 189 S.E. 2d 208 (1972). Failure of a party to serve demand for trial by jury as required by the Rules of Civil Procedure constitutes a waiver of trial by jury. *Id.;* N.C. Gen. Stat. 1A-1, Rule 38(d). DuMont did not request that a jury trial be ordered in the discretion of the Commission pursuant to N.C.G.S. 1A-1, Rule 39(b). Respondent's request for jury trial was made far beyond the required ten days. Article IX, Section 14(12), The Rules, Regulations, and Organization of The North Carolina State Bar (hereinafter State Bar Rules) expressly provides that the Rules of Civil Procedure shall apply to proceedings before the Commission, and respondent has acceded to that regulation by his extensive use of the Rules of Civil Procedure during this proceeding. N.C. Gen. Stat. app. VI, art. IX, § 14(12), 1979 Supp. *See also* Council of The North Carolina State Bar, *The Red Book.* Respondent was not unconstitutionally deprived of a trial by jury.

### III.

[5] Respondent contends he did not receive a fair and impartial hearing. A fair trial is an essential of due process. *Re Murchison,* 349 U.S. 133, 99 L.Ed. 942 (1955). He states that the Commission delayed an unreasonable length of time from the happening of the events in question until the proceedings were commenced. The events are alleged to have occurred on 27 December 1974, and these proceedings were instituted on 18 September 1978. Mr. Harold K. Bennett, an attorney of Asheville, was counsel for plaintiff in the case in Burke County in which the depositions of Kaufman and others were taken. The record is silent as to when he became aware of the alleged acts in question, but, in the

winter of 1977-78, he did notify the State Bar officials of the possible misconduct of respondent with respect to the depositions. The Bar immediately commenced an extensive investigation into the matter, resulting in the filing of the complaint on 18 September 1978. Mr. Bennett was the first chairman of the Commission, serving until shortly after the resolution of this proceeding.

DuMont appears to contend that because Mr. Bennett was chairman of the Commission, the Commission was charged with whatever knowledge he had about the actions of DuMont, and, with that knowledge, unnecessarily delayed the commencement of these proceedings. He further argues that because of this he was deprived of the testimony of Brothers, who died 28 March 1976. Mr. Bennett's knowledge can only be imputed to the Commission if it were acquired within the scope of his authority for the Commission. *Norburn v. Mackie*, 262 N.C. 16, 136 S.E. 2d 279 (1964). As chairman of the Commission, Mr. Bennett's authority related only to quasi-judicial matters; the Commission is a body judicial in nature. *See* State Bar Rules, art. IX, § 8. The investigative and prosecutorial functions of the State Bar are separate from those of the Commission. *See* State Bar Rules, art. IX, §§ 9, 12, 13. Mr. Bennett, of necessity, had to divorce his personal knowledge concerning this proceeding from his position as chairman. This is further evidenced by his recusal from participating in the hearing. There was no imputation of his knowledge to the Commission, and no laches on the part of the Commission in commencing the proceeding. *See* State Bar Rules, art. IX, § 1. We later address the matter of Brothers as a witness.

Respondent further argues the Commission erred in consolidating, for the purpose of hearing, this proceeding with three other proceedings involving respondent. One of the proceedings was dismissed at the close of the Bar's case, and the other two were dismissed at the close of all the evidence. The record on appeal does not contain any description as to the nature of the three other proceedings, and no testimony concerning them is in the record. Ordinarily, the consolidation of cases for trial is a matter in the sound discretion of the court. The State Bar Rules provide that the Commission may in its discretion consolidate for hearing two or more proceedings. State Bar Rules, art. IX, § 8(6). On the record before this Court, without any of the testimony or other matters in the other proceedings, we do not find any abuse of that discretion.

Respondent objects to the refusal of the Commission to allow into evidence for non-hearsay purposes only, statements made by Grayson Brothers, who died before the proceeding was commenced. The statements, through the witnesses DuMont and Tom Starnes, were to the effect that Brothers, the hospital administrator, stated prior to the depositions that he had no knowledge of the James letter of 23 October 1972. The statements were not offered for the truth of what they contained, but only to show that the statements had been made. The record shows, however, that testimony to this same effect is in the evidence without objection. DuMont testified:

Yes, sir, at or near the close of the conference on December 27, 1974, I was taken aside by Mr. Kaufman, who, as I recall I had met for the first time, and Mr. Kaufman said, "I have some information which has not—which apparently has not been revealed to you." And I said, "Well, what is it? Please let me know." He said, "Well, I don't have it here." And I said, "Well, I would like to see it—a copy of it, or I would like to have it to show to Mr. Brothers." He said, "Well, I don't have it here. I will try and get it to you." And I said, "Well, I'd like to see it as quickly as possible."

As to whether at that conference and at other times I had talked to Mr. Brothers regarding whether or not he had provided me with all the documents relating to this case, we had requested—the Company had requested documents. I had requested all documents. He had been furnished with copies of all Motions to Produce. I had requested every single thing from the files of the hospital. He represented and told me that the only reports that he had were those—in reference to the Advisory Committee—were those that had been furnished to me. He repeatedly told me and the carrier that. I was surprised at the comment made by Mr. Kaufman, and I said, "I would like to see what you're talking about." He said he did not have it, and I said, "Well, I will stay here. Will you go home and get it?" He said, "No, I will not." As to whether that was brought to Mr. Brothers' attention at that time, he was present at all times. Mr. Brothers commented, "I can't imagine what it is because I have furnished you with copies of everything we have." . . .

In reference to anything further from Mr. Kaufman, I received a telephone call from him on Saturday morning, the

day after the meeting, around noontime. He said, "I have a copy of the document that I was referring to you—that I referred to you which I wanted to read to you." . . . I said, "Well, can you see me before the deposition on Monday in Morganton so that I can see what you're referring to and so Mr. Brothers can see what you're referring to?" He said, "I will try to bring it to you on Monday."

. . . Before the depositions began and upon the arrival of Mr. Brothers, Mr. Kaufman, Ms. Houston and Mr. Roye, Mr. Kaufman handed me a document which was a carbon, unsigned copy, and I said, "Mr. Kaufman, I don't want to see it. Hand it to Mr. Brothers." I glanced at the document but did not read it and handed it to Mr. Brothers. Mr. Brothers appeared to read it in my presence. Mr. Kaufman, Mr. Roye, Mrs. Houston as well as myself were present there. Mr. Brothers said, "I have never seen this document. I do not know the contents. I have never seen the original of any such document such as this. Mr. James was never employed by Grace Hospital to do anything other than make a consultation for us." . . . My only recollection of any other discussion by Mr. Brothers and Kaufman is that Mr. Brothers told Mr. Kaufman that he had never received that letter. Mr. Brothers continued to insist that he had not received any letter from Dr. James other than the consultation report, that being the only thing that Mr. James had been employed to do and that they had paid him for that consultation report.

. . . .

. . . I received a letter from Mr. Grayson Brothers on or about January 3, with a copy of the letter from Dr. James attached to it. That is right, he refers in that letter to his looking through archives on the preceding day. That is right, sir, he refers in that letter that it was put away prior to June 23, 1973, when the hospital moved. Definitely this is the first time that Mr. Brothers had in any way indicated to me that he had it in his possession or had ever received a letter from Dr. James, dated October 23, 1972. According to Dr. [*sic*] Brothers' letter, this was two years after the date of Dr. James' letter. No, sir, I did not at any time have any occasion to doubt the integrity of Mr. Grayson Brothers.

. . . .

. . . No, sir, Mr. Brothers did not provide any document to me in response to said Motion. Yes, sir, I discussed with Mr. Grayson Brothers whether or not there was in his possession or in the possession of the hospital any such document as is described in the Supplemental Motion.

Respondent's Exhibit No. 20, a letter from DuMont to Tom Starnes, 27 March 1975, contained the following:

In addition, as you have doubtless been advised, I did not receive a copy of Dr. James' letter of October 23, 1972, until when the same was attached to a letter from Mr. Brothers, although I have specifically made inquiry regarding the same prior thereto, and was advised by Mr. Brothers that he did not recall any such letter having been received.

The witness Sheline testified:

MR. JARVIS: What policy violation did you think gave rise to that possible defense?

WITNESS: The existence of a letter which they said didn't exist.

MR. JARVIS: Which who had said didn't exist?

WITNESS: I beg your pardon?

MR. JARVIS: Which who said did not exist?

WITNESS: Grace Hospital representatives.

MR. JARVIS: Specifically.

WITNESS: Mr. Brothers.

Kaufman testified: "Yes, Mr. Brothers denied receiving the letter." The affidavit of DuMont (a part of the record) contains:

I was assured by Mr. Brothers that I would be furnished with all such records and related documents. . ..

. . . I received a number of documents, following which I was repeatedly advised that such constituted all of the hospital records and all other documents relative to said action.

. . . .

. . . [I]n my contacts with Mr. Brothers he repeatedly advised me that this was the only report which had been received by him or by Grace Hospital from Dr. James.

. . . .

. . . I was assured by Mr. Brothers that I had been furnished copies of all documents, including all letters from Dr. James, which had been received by the hospital.

. . . .

. . . On Monday, December 30, 1974, at the time of the taking of the deposition, Mr. Kaufman brought to me a document which he advised was a copy of a letter from Dr. Dennis James. I advised Mr. Kaufman in the presence of Mr. Brothers to deliver this letter to Mr. Brothers so that he might thoroughly examine the same. After so doing, Mr. Kaufman handed this document to Mr. Brothers. Mr. Brothers explicitly stated to me and to Mr. Kaufman that the hospital had never received such a letter and that he could not recall receiving any information regarding the contents thereof. . . .

. . . Subsequent to the taking of the depositions, I received notification for the first time from Mr. Brothers that a second letter from Dr. James, dated October 23, 1972, had been received by the hospital but that he had been unable to locate the same prior to the taking of the deposition, despite repeated efforts to do so in response to the request of both myself and my client. . . .

. . . Mr. Brothers would testify that this was the first time that I had ever been furnished with a copy of the letter attached to his letter of January 2, 1975, and that I had been repeatedly advised that no such letter had been received by the hospital.

It thus appears that the testimony respondent complains was excluded was received in evidence without objection at several places throughout the record. Error in exclusion of evidence is harmless when other evidence of the same import is admitted. *State v. Smith,* 294 N.C. 365, 241 S.E. 2d 674 (1978); *State v. Edmondson,* 283 N.C. 533, 196 S.E. 2d 505 (1973); *Terrell v. Insurance Co.,* 269 N.C. 259, 152 S.E. 2d 196 (1967); *State v. Anderson,* 26 N.C. App. 422, 216 S.E. 2d 166, *cert. denied,* 288 N.C. 243 (1975). We hold the exclusion of the testimony complained of was harmless beyond a reasonable doubt.

Next, respondent contends the Commission erred in limiting the number of character witnesses he could present. Respondent

cites no authority in support of his argument. He was allowed to present twenty witnesses and numerous letters as to character. The law is clear in North Carolina that the number of character witnesses may be limited by the court in the exercise of its discretion. *State v. Wright*, 274 N.C. 380, 163 S.E. 2d 897 (1968); *Wells v. Bissette*, 266 N.C. 774, 147 S.E. 2d 210 (1966). The order of the presentation of witnesses is controlled by the sound discretion of the court. The assignment of error is meritless.

Respondent complains he was prejudiced by questions on cross-examination concerning incidents of which he had been acquitted in criminal trials. He was asked if he had been charged with the offense of attempting to tamper with a juror. This question was, of course, objectionable. 1 Stansbury's N.C. Evidence § 112 (Brandis rev. 1973). Later, however, respondent testified at length about his criminal trial, without objection. Any prejudice arising from the one question objected to was rendered harmless beyond a reasonable doubt by respondent's subsequent testimony of the same import without objection. *State v. Wills*, 293 N.C. 546, 240 S.E. 2d 328 (1977); *State v. Flannery*, 31 N.C. App. 617, 230 S.E. 2d 603 (1976). Other questions relating to respondent's marital status were fair cross-examination in light of DuMont's testimony that he was married and had been so since 1946. Nor do we find any prejudicial error in allowing respondent to be questioned concerning his mental and emotional condition. We find no merit in this assignment of error.

IV.

[6] Respondent argues that the Commission erred in using the "greater weight of the evidence" rule as the standard of proof. He urges that the proper standard is the "clear, cogent and convincing" test, contending that the requirements of due process require a higher standard of proof when vested interests are to be affected.

Respondent recognizes that Article IX, Section 14(18), of the State Bar Rules, as in effect at the time of his hearing, adopts the standard of proof "by the greater weight of the evidence" in attorney disciplinary hearings. He urges us, nevertheless, to adopt the "clear, cogent and convincing" rule. Our Supreme Court, in *In re Palmer*, 296 N.C. 638, 252 S.E. 2d 784 (1979), approved the

standard of "clear and convincing" proof in *judicial* disbarment proceedings. In so doing, the Court stated: "We understand that the State Bar had adopted the 'preponderance of the evidence' rule for proceedings under the statutory method. Be that as it may, we feel that the 'clear and convincing' rule is more appropriate when the judicial method is followed." *Id.* at 648, 252 S.E. 2d at 790.

We are not convinced that we should impose our conception as to the appropriate standard of proof to these proceedings, when the General Assembly has empowered the State Bar to make such determination, and it has exercised that authority. We are aware that on 16 October 1980 the Council of The North Carolina State Bar adopted an amendment to section 14(18), changing the standard of proof to the "clear, cogent, and convincing" standard. However, the question before this Court is whether the rule in effect at the time of respondent's hearing was violative of his constitutional rights. We hold that it was not. The Council acted within its authority in amending the rule, but such amendment does not invalidate proceedings conducted under the former rule. Moreover, we find the evidence in this proceeding ample to sustain a burden of proof beyond a reasonable doubt. The assignment of error is overruled.

V.

[7] Last, respondent contends the findings of fact are not supported by substantial evidence and that those findings do not support the conclusions of the Commission and its decision. Without repeating our extensive review of the evidence, we hold there is substantial, competent evidence to support the findings of fact. This is true whether the "whole record" test is applied, or the "any competent evidence" standard of review is used. The whole record test

> requires the Board's judgment to be affirmed if upon consideration of the whole record as submitted, the facts found by the Board are supported by competent, material and substantial evidence, taking into account any contradictory evidence, or evidence from which conflicting inferences could be drawn. *Thompson v. Board of Education*, 292 N.C. 406, 233 S.E. 2d 538 (1977). This test is distinguishable from both *de novo* review and the "any competent evidence" standard

of review. Under the "whole record" test the reviewing court cannot replace the Board's judgment between two reasonably conflicting views, even though the court could have reached a different conclusion had the matter been before it *de novo*. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Comr. of Insurance v. Rating Bureau*, 292 N.C. 70, 80, 231 S.E. 2d 882, 888 (1977).

*Boehm v. Board of Podiatry Examiners*, 41 N.C. App. 567, 568-69, 255 S.E. 2d 328, 330, *cert. denied*, 298 N.C. 294 (1979). As the findings of fact by the Commission are supported by competent, material and substantial evidence in view of the entire record, they are conclusive upon appeal. *In re Berman*, 245 N.C. 612, 97 S.E. 2d 232 (1957); Boehm, *supra*. A fortiori, there is ample competent evidence to support the findings of fact. With this holding, we do not deem it necessary to determine in this case whether the whole record test or the any competent evidence rule is the appropriate standard for other proceedings of this nature.

Further, we hold the findings of fact amply support the conclusions of law stated by the Commission. Respondent complains of the description of the testimony as "perjured," but the Commission did not use the word in its technical legal sense, as used in the criminal law. It was using the word as meaning "false swearing." *See* Webster's Third New International Dictionary 1682 (1971).

Respondent argues eloquently in his brief reasons why the Commission should have adopted his view of the facts from the evidence presented. Presumably, these arguments were made to the trier of the facts and rejected by it. At any rate, we cannot substitute our judgment for the Commission's under either standard of review. *Boehm, supra*. Likewise, although the Commission makes strong arguments that this Court has the authority on this appeal to replace the discipline imposed upon respondent by one of our own choosing, we do not find the law to be so. Under the statute, our review is limited to "matters of law or legal inference." N.C. Gen. Stat. 84-28(h). Under that statute, we do not find authority for this Court to modify or change the discipline ordered by the Commission. By this ruling, we do not express any intimation of the authority of this Court to modify or change the

discipline ordered by a court, upon appellate review of a *judicial* disciplinary proceeding.

We hold that respondent had a full and fair hearing, in full compliance with the constitutional safeguards of due process. Upon the certification of this opinion to the Commission, the automatic stay imposed by the statute, N.C.G.S. 84-28(h), will be vacated.

Affirmed.

Chief Judge MORRIS and Judge HILL concur.