THE NORTH CAROLINA STATE BAR v. HARRY DuMONT, ATTORNEY

No. 80

(Filed 12 January 1982)

1. **Attorneys at Law § 11; Constitutional Law § 57— disciplinary or disbarment proceedings—jury trials not guaranteed by the N. C. Constitution**

   As the 1970 Constitution was clearly meant to be an editorial revision of the 1868 Constitution and as fundamental changes in the constitution were made only by separate amendment, Article I, § 25 of the N.C. Constitution, which was only editorially revised, preserves intact the right to trial by jury in all cases where the prerogative existed at common law or by statute at the time the 1868 Constitution was adopted. The Legislature in 1969 had no intention of providing a constitutional right to jury trial for attorneys in disciplinary proceedings when it submitted Article I, § 25 to the people. The legislators intended to leave such a specific matter as this for future consideration, and in 1975, the Legislature exercised its authority to deal with changing conditions and eliminated the jury trial of attorneys in disciplinary actions. G.S. 84-28.

2. **Attorneys at Law § 11— disciplinary hearings—appropriate standard for judicial review**

   As Chapter 84 of the General Statutes, the chapter which provides for discipline of attorneys, provides for no "adequate procedure for judicial review," Article 4 of G.S. Chapter 150A is the controlling judicial review statute for appeals from decisions of the State Bar Disciplinary Hearing Commission. Therefore, the appropriate standard for review for such decisions is the "whole record" test as set out in the APA. G.S. § 150A-51(5).

ON review of a decision of the Court of Appeals reported at 52 N.C. App. 1, 277 S.E. 2d 827, affirming order of the Disciplinary Hearing Commission suspending defendant from the practice of law for a period of six months.

Defendant gave notice of appeal on the ground of a substantial constitutional question, G.S. § 7A-30(1)(1981), and alternatively petitioned this Court for discretionary review pursuant to G.S. 7A-31 (Cum. Supp. 1979). We allowed his petition on 9 July 1981.

Our primary consideration on this appeal is whether an attorney subject to disciplinary action under Chapter 84 of the North Carolina General Statutes is entitled to trial by jury under Article I, § 25 of the North Carolina Constitution. We also briefly address other matters raised by defendant regarding the conduct of this disciplinary hearing.

*Aldert Root Edmonson for The North Carolina State Bar.*

*Adams, Kleemeier, Hagan, Hannah & Fouts, by Charles T. Hagan, Jr., and John P. Daniel, for defendant.*

CARLTON, Justice.

I.

Plaintiff, The North Carolina State Bar (Bar), instituted this disciplinary action before a committee of the Disciplinary Hearing Commission (Commission)[1] by a complaint filed 18 September 1978. It alleged that defendant, an attorney practicing in Asheville since his admission to the Bar in 1947, counseled and procured the false testimony of deponents in a civil action in December of 1974. Such conduct, the complaint alleged, violated certain Disciplinary Rules of the Code of Professional Responsibility.

Defendant filed answer and various motions. He denied that he had suborned perjury and moved to dismiss on the ground that the Disciplinary Hearing Commission had no personal or subject matter jurisdiction since it was not in existence at the time of the alleged misconduct. He also moved to dismiss on other grounds including laches and the assertion that a hearing before the Commission would deny his right to trial by jury as guaranteed by Article I, § 25 of the North Carolina Constitution. The motions were denied by a hearing committee of the Commission on 12 February 1979.

Defendant appealed the denial of his motions to the Court of Appeals and, pursuant to G.S. 7A-31, petitioned this Court to hear his appeal prior to determination by the Court of Appeals. On 5 June 1979 we allowed the petition and issued a writ of certiorari ordering that the record be brought before this Court. However, on 6 November 1979, we dismissed the appeal on the ground that the order denying defendant's motions was interlocutory and the appeal premature and held that the writ of certiorari was improvidently issued. *North Carolina State Bar v. DuMont,* 298 N.C. 564, 259 S.E. 2d 281 (1979).

---

1. The Disciplinary Hearing Commission was created by the Legislature in 1975. G.S. § 84-28.1 (1981).

A hearing was held before a committee of the Commission (Committee) during the week of 3 March 1980. Other unrelated charges against defendant were dismissed during the hearing, but the Committee also found that plaintiff had established the charge of procuring false testimony by the greater weight of the evidence and held defendant in violation of the disciplinary rules alleged in the complaint.[2] It was ordered that defendant's license to practice law in North Carolina be suspended for six months and that defendant not engage in any law-related employment during the suspension period. Defendant appealed to the Court of Appeals.

The Court of Appeals heard oral arguments on 6 April 1981. That court, with Judge Martin (Harry C.) writing and Chief Judge Morris and Judge Hill concurring, filed its opinion on 16 May 1981 and affirmed the order of the Disciplinary Hearing Committee. We allowed defendant's petition to review the Court of Appeals' decision on 9 July 1981.

The Court of Appeals' opinion is well written and contains a lengthy description of the facts giving rise to plaintiff's complaint against defendant. It is unnecessary to lengthen this opinion by repeating the detailed factual controversy leading to this appeal. For a complete account of the facts, see the Court of Appeals' opinion, 52 N.C. App. at 3-13, 277 S.E. 2d at 829-34.

We summarize below the holdings of the Court of Appeals:

(1) Defendant first contended that the Commission never obtained jurisdiction over his person or over the subject matter of the proceeding. He contended that this proceeding should be controlled by G.S. 84-28 as it existed at the time of his alleged misconduct, prior to the extensive amendments to Chapter 84 of our General Statutes which became effective 1 July 1975. Law of June 13, 1975, ch. 582, s. 5, 1975 N.C. Sess. Laws 656 (1975) (hereinafter "1975 amendments"). The Court of Appeals disagreed and held that the Legislature intended that the 1975 amendments apply to disciplinary hearings commenced on or after 1 July 1975,

---

2. The Commission concluded that the plaintiff had proven that defendant had engaged in conduct which violated the following Disciplinary Rules: 7-102(A)(4), 7-102(A)(6), 7-102(A)(7), 7-102(A)(8), 1-102(A)(3), 1-102(A)(4). The Disciplinary Rules governing conduct of attorneys were adopted by the State Bar pursuant to the authority granted it by G.S. 84-23.

the effective date. The Court of Appeals also held that application of the procedures included in the 1975 amendments did not constitute an unconstitutional *ex post facto* application of the law and that, while the practice of law is a property right requiring due process of law before it may be impaired, the 1975 amendments themselves in no way interfered with or impaired defendant's right to practice law. We have carefully examined the Court of Appeals' opinion and the briefs and authorities on these points. We find the resolution of these issues and the reasoning and legal principles enunciated by the Court of Appeals to be altogether correct and adopt that portion of its opinion, section I, 52 N.C. App. at 14-16, 277 S.E. 2d at 835-36, as our own.

(2) The Court of Appeals held that defendant was not deprived of due process of law by virtue of the elimination by the 1975 amendments of the right to trial by jury in attorney disciplinary matters. The court reasoned that due process does not require that a jury trial be afforded an attorney for disciplinary or disbarment procedures and held that the procedural safeguards provided by the 1975 amendments were sufficient to satisfy due process requirements.

It appears to us that the result reached on this issue is altogether correct. We approve of the reasoning employed by the Court of Appeals and the legal principles enunciated by it and adopt this portion of the Court of Appeals' opinion, section II, 52 N.C. App. at 16, 277 S.E. 2d at 836.

The Court of Appeals also held that, even if defendant were entitled to a jury trial, he waived it by failing to request a jury trial within the time limits set by Rule 38 of the N.C. Rules of Civil Procedure. In light of our disposition of defendant's claim that he has a constitutional right to be tried by a jury it is unnecessary to address the waiver issue and we express no opinion on this portion of section II of the Court of Appeals' opinion, 52 N.C. App. at 17, 277 S.E. 2d at 836-37.

(3) Defendant contended before the Court of Appeals, as he does here, that he did not receive a fair and impartial hearing. He argued that the disciplinary action was barred by laches, that the several charges against him should not have been consolidated for hearing, that several evidentiary errors were committed at the hearing, and that the Commission erred in limiting the number of

character witnesses he could present. We agree with the Court of Appeals that there was no error on these points and adopt that portion of its opinion, section III, 52 N.C. App. at 17-23, 277 S.E. 2d at 837-40, as our own.

(4) Defendant also challenged the standard of proof employed by the Commission at his hearing. He contended that the Commission erred in using the "greater weight of the evidence" rule and that it should have used the "clear, cogent and convincing" test in determining whether plaintiff had satisfied its burden of proof.

The Court of Appeals rejected this argument. It noted that the State Bar in its rules had adopted the standard of the greater weight of the evidence, State Bar Rules Article IX, sec. 14(18),[3] and concluded that it should not interfere with a standard which the General Assembly empowered the State Bar, by its Council, to adopt. *See* G.S. § 84-23 (1981).

We agree with the Court of Appeals that due process does not require the higher burden and that the courts should not meddle in matters left to the State Bar by our Legislature. As to this question we adopt the Court of Appeals' opinion, section IV, 52 N.C. App. at 23-24, 277 S.E. 2d at 840-41, as our own.

(5) Before the Court of Appeals, the defendant argued that Article 4 of the Administrative Procedure Act (APA), G.S. § 150A-43 to -52 (1978), governs review of his appeal from the Disciplinary Hearing Commission and, accordingly, that the proper standard of review of the Commission's findings was the "whole record" test of G.S. 150A-51(5) and not the "any competent evidence" standard urged by the Bar. The Court of Appeals did not reach the question whether the APA governs judicial review of decisions of the Disciplinary Hearing Commission because it found the evidence supporting the findings of the Commission sufficient under either test. While we agree with the Court of Appeals that the evidence is sufficient under either the "whole record" or "any competent evidence" test, we think it necessary to decide which standard is appropriate for review of this appeal. We address this question below.

---

3. State Bar Rules Article IX, sec. 14(18) was amended effective 13 November 1980 to provide that the charges must be proved by "clear, cogent and convincing evidence." Amendments to Rules Relating to Discipline and Disbarment of Attorneys, 300 N.C. 753, 754 (1980).

(6) The Bar assigned error to the disciplinary measure imposed by the Commission and argued to the Court of Appeals that it had authority to impose more severe measures. The Court of Appeals rejected this contention, holding that the statute providing for judicial review, G.S. 84-28(h), does not give a reviewing court the authority to modify or change the discipline properly imposed by the Commission. We agree with the reasoning of the Court of Appeals and adopt its discussion of this issue, 52 N.C. App. at 25-26, 277 S.E. 2d at 841-42, as our own.

## II.

While holding that due process of law does not require that an attorney is entitled to a jury trial in a statutory disciplinary or disbarment proceeding, the Court of Appeals did not consider whether a jury trial in such a proceeding is guaranteed attorneys by the North Carolina Constitution. We turn to a consideration of that question.

[1] Defendant contends that he had a constitutionally guaranteed right to a jury trial. He bases this argument on Article I, § 25 of the North Carolina Constitution (1970 Constitution), adopted on 3 November 1970, which provides that "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and shall remain sacred and inviolable." The predecessor to this provision in the Constitution of 1868 (1868 Constitution), has been interpreted to preserve as a constitutional right the right to trial by jury in civil cases when that prerogative existed at common law or by statute at the time the 1868 Constitution was adopted. *In re Wallace*, 267 N.C. 204, 147 S.E. 922 (1966); *In re Annexation Ordinance*, 253 N.C. 637, 117 S.E. 2d 795 (1961); *Belk's Department Store, Inc. v. Guilford County*, 222 N.C. 441, 23 S.E. 2d 897 (1943); *Groves v. Ware*, 182 N.C. 553, 109 S.E. 568 (1921). As stated in Groves:

> The right to a trial by jury, which is provided in this section, applies only to cases in which the prerogative existed at common law, or was procured by statute at the time the Constitution was adopted, and not to those where the right and the remedy with it are thereafter created by statute.

182 N.C. at 558, 109 S.E. at 571. Defendant contends that this interpretation should apply with equal force to the 1970 Constitu-

tion so that all rights to jury trial recognized at common law and provided by statute *at the time the 1970 Constitution was adopted* are now of constitutional dimension.

On 3 November 1970, the date the 1970 Constitution was adopted, G.S. 84-28(3)(d)(1)(1975) (amended 1975) granted the attorney charged in a statutory disciplinary action the right to a trial "[i]n the superior court at a regular term for the trial of civil cases by a judge and jury."[4] Some form of this provision providing the right to a jury trial has been in our General Statutes since 1933. Law of April 3, 1933, Ch. 210, s. 11, 1933 N.C. Sess. Laws 313 (1933); Law of February 22, 1937, Ch. 51, s. 3, 1937 N.C. Sess. Laws 98 (1937); Law of June 21, 1961, Ch. 1075, 1961 N.C. Sess. Laws 1482 (1961). However, effective 1 July 1975 the Legislature amended G.S. 84-28 to provide for disciplinary action "under such rules and procedures as the council [of the North Carolina State Bar] shall promulgate." G.S. § 84-28(a)(1981). These rules do not provide for a trial by jury. If defendant is correct in arguing that the adoption of Article I, § 25 in the 1970 Constitution extends the constitutional right to jury trial, then because there existed a statutory right to trial by jury in attorney disciplinary proceedings on 3 November 1970, subsequent legislative action cannot diminish or deprive him of that right and he is constitutionally entitled to a jury trial in these proceedings. Thus, our inquiry is limited to determining whether the principle of law announced in *Groves* is equally applicable to the 1970 Constitution.

Whether the adoption of the 1970 Constitution extended the constitutional right to trial by jury to those rights then existing at common law or by statute is a question of constitutional construction.

This question is, in the main, governed by the same general principles which control the interpretation of all written instruments. *Perry v. Stancil,* 237 N.C. 442, 444, 75 S.E. 2d 512, 514 (1953). "[T]he fundamental principle of constitutional construction is that effect must be given to the intent of the framers of the

---

4. Our discussion of this issue is limited to *statutory* disciplinary proceedings. There has never been in this juridiction a right to jury trial in judicial disciplinary actions. *See In re Northwestern Bonding Co., Inc.,* 16 N.C. App. 272, 192 S.E. 2d 33, *cert. denied,* 282 N.C. 426, 192 S.E. 2d 837 (1972).

organic law and of the people adopting it." 16 Am. Jur. 2d Constitutional Law § 92 (1979). Therefore, courts should keep in mind the object sought to be accomplished by its adoption, and proper recourse should be given to the evils, if any, sought to be prevented or remedied. 16 C.J.S. Constitutional Law § 32 (1956); 16 Am. Jur. 2d, *supra* at § 123. Reference may be had to unofficial contemporaneous discussions and expositions in arriving at a correct interpretation of the fundamental law. *Id.* at § 130.

In *Perry* this Court said:

Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption. To ascertain the intent of those by whom the language was used, we must consider the conditions as they then existed and the purpose sought to be accomplished. Inquiry should be directed to the old law, the mischief, and the remedy. The court should place itself as nearby as possible in the position of the men who framed the instrument. (Citations omitted.)

A court should look to the history, general spirit of the times, and the prior and the then existing law in respect of the subject matter of the constitutional provision under consideration, to determine the extent and nature of the remedy sought to be provided. (Citations omitted.)

*Perry v. Stancil,* 237 N.C. at 444, 75 S.E. 2d at 514.

In summary, we are to determine (1) the intent of the framers and people adopting the 1970 Constitution, (2) the object and purpose of the 1970 Constitution, and (3) the evils, if any, sought to be remedied by that document. We proceed to do so under the general guidelines noted above.

Our examination into the circumstances of the 1970 constitutional revision leads us to the conclusion that neither its framers nor the citizens voting for it contemplated that Article I, § 25 of the new document would become the new critical point of reference for application of the principle of law now before us. Indeed, we think that the revisions to most of Article I, and most certainly to § 25, represent nothing more than editorial changes designed to modernize the language and arrangement of the Arti-

cle by clarifying obsolete matter and organizing the matter in more logical sequence.

In ascertaining the intent of the framers and adopters, the object and purpose of the revision, and the evils sought to be remedied, we find it helpful to look to the *Report of the North Carolina State Constitution Study Commission* (1968) (hereinafter cited as "Report"). This Report, prepared by a study commission which met throughout 1968 under the sponsorship of the North Carolina State Bar and the North Carolina Bar Association, was transmitted to the Governor and General Assembly and served as the primary source of guidance for the 1969 legislative session. Indeed, a comparison of the recommendations made in the Report with those finally submitted by the General Assembly and adopted by the people in 1970 reveals that our Legislature relied almost exclusively on the Report. Hence, a close study of the Report allows us "to place [ourselves] as nearly as possible in the position of the men who framed the instrument" and allows us to "look to the history [and] general spirit of the times," *Perry v. Stancil,* 237 N.C. at 444, 75 S.E. 2d at 514, in making our determination here.

In discussing its objectives and approach, the State Constitution Study Commission (Study Commission) stated:

> In order to achieve this general objective of an up-to-date constitution, we consider it necessary to eliminate from the constitution obsolete and unconstitutional provisions, *to simplify and make more consistent and uniform the language of the document,* to reorganize its content in some instances for the sake of greater clarity . . . .

Report, at 3 (emphasis added).

Further, the Study Commission noted that the revised document

> effects a general editorial revision of the constitution, which will be referred to here as "the proposed constitution." The deletions, reorganizations, and improvements in the clarity and consistency of language will be found in the proposed constitution. Some of the changes are substantive, *but none is calculated to impair any present right of the individual citizen or to bring about any fundamental change in the*

*power of state and local government or the distribution of that power.*

Report, at 4 (emphasis added).

The passages quoted above evince a clear intent on the part of the framers of the new document merely to update, modernize and revise editorially the 1868 Constitution. An intent to modernize the language of the existing constitution does not, in our opinion, show that the framers of the 1970 Constitution intended that instrument to enlarge upon the rights granted by the 1868 Constitution. Indeed, we think that such an intent shows that the 1970 framers intended to preserve intact all rights under the 1868 Constitution.

Our view is buttressed by another noted commentator. In his article "A Brief History of the Constitutions of North Carolina," John L. Sanders, Director of the Institute of Government, emphasized the editorial nature of the new document submitted to the people in 1970 vis-a-vis the substantive amendments which appear in our present Constitution which were submitted to the people as entirely *separate amendments*:

> The Commission combined in a revised text of the Constitution all of the *extensive editorial changes* that it thought should be made in the Constitution, together with such substantive changes as the Commission deemed *not to be controversial or fundamental in nature.* These were embodied in the document that came to be known as the Constitution of 1971. Those proposals for change that were deemed to be sufficiently fundamental or potentially controversial in character as to justify it, the Commission set out as independent amendment propositions, to be considered by the General Assembly and the voters of the State on their independent merits.

Sanders, *The Constitutional Development of North Carolina,* in *North Carolina Manual* 87, 93 (1979) (emphases added).

In other words, the new document enacted in 1970, of which Article I, § 25 is a part, was not a fundamentally new constitution. It was an extensive editorial revision of the 1868 document. The evils sought to be remedied were obsolete language, outdated style and illogical arrangement. The intent, object and purpose of

the framers and adopters was to correct those evils. Important and significant substantive changes were not included in the new document submitted in 1970, but were dealt with in amendments separately submitted to the people of North Carolina for their approval.

In addition to the revised constitution, the Study Commission recommended nine separate amendments to our Legislature.[5] Numerous other proposals for amendment were submitted during debate. Six were ultimately approved by the General Assembly and submitted to the voters: the executive reorganization amendment, Article III, §§ 5(10), 11, the state and local finance amendment, Article V, an amendment to the income tax provision of the constitution, Article V, § 2(6), a reassignment of the benefits of escheats, Article IX, § 10, authorization for calling extra legislative sessions on the petition of members of the General Assembly, Article II, § 11(2), and abolition of the literacy test for voting. Of the six separate amendments submitted to the people, only the literacy test repeal was rejected.

---

5. The amendments to the newly revised constitution recommended by the Study Commission were:

    1. Requiring judges and solicitors to be licensed attorneys, and requiring the General Assembly to establish a mandatory retirement age for judges and procedures for the disciplining and removal of judicial officers;

    2. Granting the veto power to the Governor;

    3. Empowering the voters to elect a Governor and Lieutenant Governor for two successive terms;

    4. Providing for a change in the mode of selection of certain state executive officers;

    5. Reducing the residence time for voting in state elections to six months;

    6. Authorizing trial on information and waiver of jury trial in noncapital cases;

    7. Requiring the General Assembly to reduce the administrative departments to 25 and authorizing the Governor to reorganize the administrative departments, subject to legislative disapproval;

    8. Revising the income tax provision to make possible joint returns by husband and wife and accommodation of the State to the federal income tax;

    9. Reassigning future escheats.

*Report*, at 4.

That the document submitted to the voters in 1970, and in which Article I, § 25 was included, was intended to effectuate mere editorial changes in the 1868 document is evident in light of the submission of the fundamental and substantive changes in the form of separate amendments. Indeed, the far-reaching finance amendment enacted at the same time as the editorially revised document in 1970 did not take effect until 1 July 1973, two years later than the newly written document. That the drafters and adopters did not intend the 1970 revision to embrace substantive and fundamental changes is indicated by the numerous amendments to the 1970 document adopted by the people. In addition to the amendments adopted at the same time as the 1970 Constitution, five more amendments were submitted by the General Assembly of 1971 and these were adopted by the people on 7 November 1972. These amendments (1) established the constitutionally-specified voting age at eighteen years, Article VI, §§ 1, 6, (2) required the General Assembly to set maximum age limits for service as justices and judges of the state courts, Article IV, § 8, (3) authorized the General Assembly to prescribe procedures for the censure and removal of state judges and justices, Article IV, § 17, (4) added to the Constitution a statement of policy regarding conservation and the protection of natural resources, Article XIV, § 5, and (5) limited the authority of the General Assembly to incorporate cities and towns within close proximity to existing municipalities, Article VII, § 1. The 1973 Session of the General Assembly submitted to the voters in November 1974 an amendment changing the title of solicitor to that of district attorney, Article IV, § 18. Also submitted at that time was an amendment authorizing the use of revenue bonds to construct industrial facilities. The people ratified the amendment changing the title of solicitor, but that concerning revenue bonds for industrial facilities was defeated. Two amendments were also submitted to the people by the 1975 Legislature. Both dealt with the use of revenue bonds to finance construction, the first for health care facilities and the second for industrial facilities, a modification of the amendment rejected in 1974. Both were ratified by the voters on 23 March 1976. N.C. Constitution art. V, §§ 8, 9.

In 1977 the citizens of this state adopted amendments permitting consecutive terms for the Governor and Lieutenant Gover-

nor, Article III, § 2, requiring a balanced state budget, Article III, § 3, permitting joint ownership of generation and transmission facilities, Article V, § 10, enlarging the homestead exemption, Article X, § 2(3), § 2(4), and enlarging the entitlement to the life insurance exemption, Article X, § 5. The voters adopted in 1979 an amendment requiring that all state justices and judges be duly authorized to practice law, Article IV, § 22.

The submission of substantive amendments separate and apart from the new constitution shows clearly that the intent and purpose of the framers of the 1970 Constitution was to revise editorially only the 1868 Constitution. Substantive and fundamental matters were left to separate amendments to be considered individually by the voters.

Clearly, the new provision on civil jury trials, Article I, § 25, represents only a minimal editorial change. The counterpart provision in the 1868 Constitution provided that trial by jury "ought to remain sacred and inviolable." N.C. Const. art. 1, § 19 (1868). Article I, § 25 of the present document mandates that trial by jury "*shall* remain sacred and inviolable." (Emphasis added.) Defendant argues that this slight change in wording supports his position. He contends that use of the word "shall" indicates an intent by the drafters and adopters to place an even higher value on the right to trial by jury. We agree with defendant that the drafters and adopters considered the right to trial by jury to be vitally important. However, we are unable to find that the drafters and adopters singled out this particular right for special treatment and must conclude that the change is an editorial one. As Mr. Sanders stated:

> The Declaration of Rights (Article I), which dates from 1776 with some 1868 additions, was retained with a few additions. The organization of the article was improved and the frequently used subjunctive mood was replaced by the imperative in order to make clear that the provisions of that article are commands and not mere admonitions. (For example, "All elections ought to be free" became "All elections shall be free.")

Sanders, *supra* at 94.

Finally, we note our strong belief that our Legislature in 1969 had absolutely no intention of providing a constitutional

right to jury trial for attorneys in disciplinary proceedings when it submitted Article I, § 25 to the people. We think that the historial treatment of constitutional matter by our Legislature impels the conclusion that our legislators intended to leave such a specific matter as this for future consideration. As Mr. Sanders has stated,

> The fact that we have adopted only three constitutions in two centuries of existence as a state . . . reflects the fact that North Carolina has been less disposed than have many states to write into its state constitution detrailed [sic] provisions with respect to transitory matters better left to legislation. The Constitution has allowed the General Assembly wide latitude for decision on public affairs, and legislators have been willing to accept responsibility for and act on matters within their authority instead of passing the responsibility for difficult decisions on to the voters in the form of constitutional amendments.

Sanders, *supra* at 98.

The Legislature, in submitting the new constitution containing Article I, § 25 to the people of North Carolina, sought to protect basic rights from encroachment by the state and to establish a framework for government. The 1970 Constitution, like its predecessors, dealt not with temporary conditions but with general principles which must remain intact. Response to changing conditions was left for future legislation. In 1975, the Legislature exercised its authority to deal with changing conditions and eliminated the right to jury trial of attorneys in disciplinary actions.

With such clear indications that the 1970 Constitution was meant to be an editorial revision of the 1868 Constitution and that fundamental changes in the constitution were made only by separate amendment we must reject defendant's argument that the adoption of the revised constitution effected a radical change in the constitutional entitlement to jury trial in civil cases. Surely, "if such was the intention, it is reasonable to presume it would have been declared in direct terms, and not be left as a matter of inference." *Perry v. Stancil,* 237 N.C. at 447, 75 S.E. 2d at 516. Absent a clear expression of an intent to make fundamental changes, we cannot assume that such was the intent of the

framers of the 1970 document. Nor can we assume that, whatever the intent of the framers, the citizens intended by their adoption at the polls of the 1970 constitutional changes to effect such a radical change. With no evidence presented that the intent was to do more than editorially revise Article I, § 25, "we cannot read into the voice of the people an intent that in all likelihood had no occasion to be born." *Sneed v. Greensboro City Board of Education,* 299 N.C. 609, 616, 264 S.E. 2d 106, 112 (1980).

Our decision today does not overrule or diminish the principle of law established in *Groves* and its progeny. *Groves* held that the predecessor to our present Article I, § 25 (Article I, § 19 of the 1868 Constitution) preserved the right to trial by jury in those instances in which the right existed at common law or by statute as of the date the 1868 Constitution was adopted. We agree: the relevant date for determining the scope of the constitutional right to jury trial in civil cases is the date of adoption of the 1868 Constitution. Subsequent adoption of an editorially revised constitution, because of the nature of the purpose of such a revision, does not operate to alter the rights granted by the prior constitution.

We hold that Article I, § 25 of the North Carolina Constitution preserves intact the right to trial by jury in all cases where the prerogative existed at common law or by statute at the time the 1868 Constitution was adopted.

III.

[2] Left unresolved by the Court of Appeals' decision was the question concerning the appropriate standard for judicial review of a decision of the Disciplinary Hearing Commission. In light of our adoption of that portion of the Court of Appeals' opinion holding the evidence sufficient to support the conclusions of law stated by the Commission, the resolution of this issue is unnecessary. However, in light of the serious conflict in contentions between the parties to this cause and for the guidance of the Commission in future cases, we briefly answer that contention here.

The State Bar contends that the appropriate standard for review is the "any competent evidence" test stated in *Cogdill v. North Carolina State Highway Commission,* 279 N.C. 313, 182 S.E.

2d 373 (1971). Defendant contends that the appropriate standard for review is the "whole record" test as set out in the APA. G.S. § 150A-51(5). For the reasons stated below we agree with defendant that the APA standard applies.

G.S. 150A-43, a part of the Administrative Procedure Act (APA), provides in pertinent part that, "[a]ny person who is aggrieved by a final agency decision . . . is entitled to judicial review of such decision under this Article, unless adequate procedure for judicial review is provided by some other statute, in which case the review shall be under such other statute." In determining what is "adequate procedure for judicial review," as those words appeared in our former statute, G.S. 143-307, this Court held that an adequate procedure for judicial review exists "only if the scope of review is equal to that under G.S. Chapter 143, Article 33, 143-306 *et seq.*" *Jarrell v. Board of Adjustment,* 258 N.C. 476, 480, 128 S.E. 2d 879, 883 (1963). Effective 1 February 1976, G.S. 143-307 was replaced by G.S. 150A-43. Law of March 24, 1975, ch. 69, 1975 N.C. Sess. Laws 44 (1975); Law of April 12, 1974, ch. 1331, 1973 N.C. Sess. Laws 691 (1974). In *Commissioner of Insurance v. North Carolina Rate Bureau,* 300 N.C. 381, 395, 269 S.E. 2d 547, 559 (1980), we held that " 'adequate procedure for judicial review,' as those words appear in present G.S. 150A-43, exists only if the scope of review is equal to that under present Article 4 of G.S. Chapter 150A."

Our review of Chapter 84 of our General Statutes, the chapter which provides for discipline of attorneys, leads us to conclude that there is no "adequate procedure for judicial review" there. Hence, we now hold that Article 4 of G.S. Chapter 150A is the controlling judicial review statute for appeals from decisions of the State Bar Disciplinary Hearing Commission.

Plaintiff contends that the APA is not applicable to these proceedings because neither the State Bar nor the Disciplinary Hearing Commission is a part of the executive branch of government. We do not attempt to answer that question here but simply find the argument unpersuasive. As indicated above, the clear intent of our Legislature is to make the "whole record" test the principle standard of judicial review of administrative findings in this state. We adopt that test here and indeed have done so before. *See In re Rogers,* 297 N.C. 48, 253 S.E. 2d 912 (1979) (ap-

plying the "whole record" test to appeals from decisions of the Board of Law Examiners).

In applying the whole record test to the facts disclosed by the record, a reviewing court must consider the evidence which in and of itself justifies or supports the administrative findings and must also take into account the contradictory evidence or evidence from which conflicting inferences can be drawn. *Thompson v. Wake County Board of Education,* 292 N.C. 406, 233 S.E. 2d 538 (1977). Under the whole record test there must be substantial evidence to support the findings, conclusions and result. G.S. § 150A-51(5). The evidence is substantial if, when considered as a whole, it is such that a reasonable person might accept as adequate to support a conclusion. *Thompson v. Wake County Board of Education,* 292 N.C. 406, 233 S.E. 2d 538. Applying this test to the facts disclosed by the record before us, we find that the findings, inferences, conclusions and decision of the Disciplinary Hearing Commission are supported by substantial evidence in view of the entire record.

Except for the modifications noted above and our refusal to address that portion of the Court of Appeals' holding that respondent waived trial by jury, the decision of the Court of Appeals is affirmed.

Modified and affirmed.