THE NORTH CAROLINA STATE BAR, Plaintiff v. AMIEL J. ROSSABI
& EMILY J. MEISTER, Defendants

No. COA06-583

(Filed 5 June 2007)

**1. Appeal and Error— appealability—denial of summary judgment—appeal after trial—not reviewable**

The denial of summary judgment is not reviewable on appeal from final judgment after trial on the merits, and the question here of whether the Disciplinary Hearing Commission of the State Bar improperly denied defendants' motion for summary judgment was not considered.

**2. Appeal and Error— preservation of issues—assignment of error—too general—not considered**

An assignment of error that the Disciplinary Hearing Commission of the State Bar erred in its evidentiary ruling was too generic and was not considered.

**3. Attorneys— discipline—request for admission—finding by Disciplinary Hearing Commission—not supported by evidence**

A decision by the Disciplinary Hearing Commission of the State Bar to discipline defendants did not have a rational basis in the evidence and was reversed. It is apparent from the totality of the record that defendants believed they had legitimate reasons for making a request for admissions about a romantic relationship between opposing counsel and his client, and plaintiff offered no clear, cogent, and convincing evidence to the contrary.

Appeal by defendants from judgment entered 30 November 2005 by a hearing committee of the Disciplinary Hearing Commission of the North Carolina State Bar. Heard in the Court of Appeals 10 January 2007.

*The North Carolina State Bar, by A. Root Edmonson and David R. Johnson, for the plaintiff-appellee.*

*Forman Rossabi Black, P.A., by T. Keith Black, for the defendants-appellants.*

ELMORE, Judge.

Amiel J. Rossabi and Emily Jeffords Meister (defendants) appeal from an order of the North Carolina Disciplinary Hearing Commission (DHC), which issued an Admonition to defendant Rossabi and a Letter of Warning to defendant Meister on 30 November 2005. For the following reasons, we reverse the decisions of the DHC.

BACKGROUND

On 14 November 2003, Steven M. Cheuvront, an attorney practicing in Morganton, filed a complaint against defendants for violation of Rule 3.4(d) of the North Carolina Revised Rules of Professional Conduct (Rules of Professional Conduct). Rule 3.4(d) states that a lawyer shall not, "in pretrial procedure, make a frivolous discovery request." 27 NCAC 2.3.4(d) (2007). The frivolous discovery request at

issue here was a request for admission, filed 14 November 2003, made by defendants during their representation of Nanhall Professional Grooming, Inc. (Nanhall) and Hayley Marie Keyes, Nanhall's owner, in a lawsuit brought by Avery Animal Hospital, Inc. (Avery Animal Hospital) and Dr. Joanne Lackey, who was represented by Cheuvront. The request for admission, addressed to Lackey, read as follows, "Admit that, at some time during the last two years, you have been involved in a personal or romantic relationship with attorney Steven M. Cheuvront." Immediately after receiving and reviewing the request, Cheuvront called Lackey, called his wife, and talked to a retired judge. Cheuvront then sent his complaint to the North Carolina State Bar (plaintiff).

During the DHC hearing, Cheuvront testified that he did, in fact, have a personal relationship with Lackey, but that that relationship was not romantic. He further testified that the part of the question "that offended [him] personally was the romantic part because that could not be farther from the truth."

The Avery Lawsuit

To understand the substance of this appeal, we first review the underlying matter between Cheuvront's clients and defendants' clients (the Avery Lawsuit), as well as the events between Cheuvront and defendants that lead to the case before us. The lawsuit involved an employment agreement between Lackey and Aaron Daniels. Daniels, a minor at the time the agreement was signed, agreed to work for Lackey as a groomer at Avery Animal Hospital in Avery County for a minimum of three years. In exchange, Lackey agreed to pay for Daniels to attend Nanhall. The contract stipulated that "[i]f employee fails to work for the (3) three-year period, the employee agrees to reimburse the employer the full amount of Grooming School Costs, which equals $6,170.00 within 30 days of the last day of employment." Daniels attended Nanhall, located in Greensboro, and met and married a woman in Greensboro. Not wanting to abandon his new life, he accepted a job at Nanhall and elected not to return to Avery County to work for Lackey. Lackey and Avery Animal Hospital sued Daniels for breach of contract and Nanhall for tortious interference of contract and unfair and deceptive trade practices. Nanhall hired defendants to represent it and Daniels hired Charles Hunt to defend him.

Before the lawsuit was filed, Lackey rejected a certified check for $6,170.00, offered by Daniels's grandmother; the lawsuit was subse-

quently filed. Defendant Rossabi testified before the DHC as to why he thought Lackey did not have a valid legal claim against his clients:

> So there's obviously the defense that you have for a minor can't contract. I put that aside because I wasn't representing Mr. Daniels. . . . You can't have unfair and deceptive trade practice in a case like this. One, there's a contract that governs the whole relationship, and that's why on it's [sic] face it was dismissible. There's nothing there. In addition, you can't have an unfair and deceptive trade practice and ask for punitive damages. It's a treble-damage claim. You then have a tortious interference contract claim . . . Well, the main element of tortious interfering with a contract is you have to have a malicious, non-business purpose. So if I have a business where I can use somebody, the law is clear . . . that I can hire somebody away from somebody . . . .

Defendants pushed forward with the lawsuit, requesting summary judgment on both causes of action. Eventually, and after plaintiff's inquiry had begun, the trial court granted summary judgment to Nanhall as to the unfair and deceptive trade practices, and eventually dismissed the tortious interference motions at the close of Cheuvront's evidence.

During the mediation that preceded the disputed discovery request, defendants offered to Cheuvront a number of cases suggesting that Lackey could not, as a matter of law, prevail on her claims against Nanhall. During that same mediation session, Daniels offered a confession of judgment, which Lackey rejected. Plaintiff, in its opening statement before the DHC, stated that the confession of judgment was rejected because Daniels, "at least at the time the contract was entered into, was just 17, about to turn 18. And you can understand why did they might not want to just [sic] a confession of judgment from a young defendant that may have no ability to pay the judgment." Cheuvront himself testified that "the judgment would not be collectible and that there were further damages that we felt were the responsibility of Nanhall's involvement." Shortly before making that statement, he testified that Nanhall "had the ability to pay, and we were suing them for damages."

Keyes testified that

> During the entire mediation, [Mr. Cheuvront] was very hostile. At one point he was offered money; he rejected it. At another point toward the end of the mediation, he was very upset over the fact that we did not settle because he had never been to a mediation

where no one had settled before. So he was very rude to us. At the end of it he also said to me that he was going to make it so that I would not have a pot to piss in . . . .

During Meister's testimony about the same mediation, she stated that

Mr. Cheuvront, for lack of a better description, threw a temper tantrum in which he said that he had never been to a mediation where parties came in unwilling to make offers. He was outraged. He was pacing and muttering and doing his arms and at that point was getting louder and louder as he continued. He then said, "I mean, you basically showed up here today and said, 'Screw you' " to me. And as he did that, he made a gesture that I found in the setting that we were in extremely unprofessional and offensive . . . He let me know during that ranting and raving that he was handling the case *pro bono*. He said that he was handling it *pro bono* and that if I lost the Motion for Summary Judgment, he would take the case all the way to the Supreme Court and that at the end of it, if he won, my clients wouldn't be able to write a check big enough to cover it.

Cheuvront testified that he did not have a contract for payment with Lackey, but that they did have an oral agreement in which "[she] had agreed to help us out on our vet bills and cut us a break from time to time. . . . It wasn't an exchange of payment; I did it as a friend."

Keyes testified that after the mediation, she was standing outside the courtroom with the other mediation participants when

The comment was made, "Well, that must be why the rumors are going around." And Aaron [Daniel]'s lawyer happened to be looking down the street, whereupon, I turned to look down the street, and Mr. Cheuvront was with Dr. Lackey. And the way he was walking next to her was extremely close; but also they were getting ready to get to a car, and he had put his arm around her shoulders.

Defendant Meister returned to Greensboro and discussed the day's incidents with defendant Rossabi:

I was very concerned about the allegations that had been made. One of the things that had been harped on in my ethics class was romantic relationships between client and attorney. And so my first question to Mr. Rossabi was do we have to report this to the

Bar. And Mr. Rossabi said that before he reported somebody to the Bar he would like to know a little bit more about it and was it just rumor and thought that we should look into it more before we took that step.

I also was concerned as to what effect this would have on our clients and on the lawsuit. And Mr. Rossabi and I discussed at that time bias, the abuse of process, potential counterclaim, which . . . we could have brought either in that action or in a later action. We also talked about any potential ramifications it would have to a Motion for Attorneys' fees under 6-21.5.

Defendant Meister then drafted the discovery, which included the request for admission at issue. When asked about the intentions behind that discovery request, she testified:

My intentions were, one, to satisfy any issues about our obligation to report Mr. Cheuvront to the Bar; two, to look out for my clients' best interest. And in looking out for my clients' best interest, the abuse for process, bias and a Motion for Attorneys' Fees. Again, there was no intent to harass Mr. Cheuvront. I didn't even know Mr. Cheuvront was married. No intent to embarrass him or harass him in any way.

Disciplinary Action by the State Bar

·On 1 December 2003, plaintiff sent Letters of Notice to defendants notifying them that a grievance had been filed against them, and indicating that defendants had violated Rules 3.4(d), 8.4(c), and 8.4(d) of the Rules of Professional Conduct. Defendants responded to these Letters of Notice on 15 December 2003, explaining the factual background of the request for admission and explaining that the request:

was in no way intended to harass or embarrass Dr. Lackey, and was not frivolous within the language of Rule 3.4 of the Rules of Processional [sic] Conduct. Likewise, in no way did [their] conduct involve dishonesty, fraud, deceit, misrepresentation or prejudice to the administration of justice as covered by Rule 8.4(c) and (d).

Plaintiff acknowledged receipt of defendants' responses on 17 December 2003 and 19 December 2003. On 12 February 2004, plaintiff sent a letter asking two additional questions, which letter defendants responded to on 18 February 2004.

The Grievance Committee of the North Carolina State Bar met on 22 April 2004, and considered the grievances filed against defendants by Cheuvront. In a preliminary hearing in the matter of defendant Rossabi, the Grievance Committee found probable cause, which is defined as "reasonable cause to believe that a member of the North Carolina State Bar is guilty of misconduct justifying disciplinary action." 27 NCAC 1B.0103(37) (2007). On 13 May 2004, plaintiff issued a reprimand in written form to defendant Rossabi because the Grievance Committee determined that defendant Rossabi had violated Rules 3.4 and 8.4(d) of the Rules of Professional Conduct. The Grievance Committee found that the request for admission "was improper, as it was intended to harass and embarrass not only Mr. Cheuvront's client, but Mr. Cheuvront as well."

The Grievance Committee did not find probable cause to justify imposing discipline against defendant Meister, and dismissed the grievance against her. "Nevertheless, the committee determined that [her] conduct constituted an unintentional, minor, or technical violation of the Revised Rules of Professional Conduct," and issued a Letter of Warning. On 17 May 2004, both defendants rejected their reprimands, effectively appealing the Grievance Committee's decisions to the DHC. In the 19 May 2004 letter accompanying the rejections, defendant Rossabi noted a significant discrepancy between plaintiff's conclusions and information previously provided by defendants:

> I am deeply troubled by all of the Committee's conclusions contained in its May 13, 2004 Warning and Reprimand letters. As an example, in the May 13 letters, Mr. McMillan (for the Committee) states that Ms. Meister and I "admitted in [our] response that the question about an alleged romantic involvement between Mr. Cheuvront and Dr. Lackey was not relevant to [our] consideration of filing a counterclaim or separate action for abuse of process against Mr. Cheuvront's client." That is incorrect. I am attaching a copy of my February 18, 2004 letter to the Bar, in which I stated:

> Mr. Cheuvront's alleged romantic involvement with his client is *directly relevant* to this claim in that such involvement may be used to show, among other things, lack of a justiciable claim. Furthermore, such involvement is *very relevant* to Defendants' potential claim for abuse of process, which may be brought either as a counterclaim in this action or in a separate action.

On 24 May 2004, plaintiff issued new reprimands that replaced the words "not relevant" with "relevant," and stated that a mistake had been made in the previous reprimands.

Defendant Rossabi, in his 19 May 2004 letter, made two assertions, which form the backbone of defendants' claim on appeal:

> The Committee also indicates that I had improper motives in serving my discovery and was being disingenuous in responding to the Grievance, *though no one has ever spoken with me about this matter*. My only motive in serving the subject admission was to discover facts that may lead to the discovery of admissible evidence (in the pending action and, potentially, a counterclaim).

> Finally, *the Committee seems to ignore my reasonable belief that an improper relationship existed and, therefore, would be directly relevant to the case*. My reasonable belief was based on several factors, including a statement of another lawyer who practices in the community at issue. If the allegations are, in fact, true, I assume the Committee would agree that I would have to consider using that evidence in my defense of the lawsuit. The best way, in my opinion, to learn if the allegations were, in fact, accurate was to request an admission.

(Emphasis added).

Defendants again contacted plaintiff on 8 June 2004 to request that the Grievance Committee reconsider the Reprimand and Letter of Warning. Defendants included a number of facts that they considered relevant to the decision to make the request for admission, as well as several legal arguments that they felt could sway the Grievance Committee to dismiss the reprimands. Plaintiff responded on 11 August 2004 by reissuing the Reprimand and Letter of Warning. Defendants again rejected the reprimands in August, 2004.

Defendants next contacted plaintiff on 17 February 2005, requesting plaintiff to "reconsider and rescind any disciplinary rulings," as well as to respond in some way to defendants' rejection of the reprimands because they had "since heard nothing from the State Bar and [had] been left in 'limbo.' "

The parties were then heard before the DHC on 28 October 2005, and the DHC found as fact that "Request number 5 of the requests for admission was not relevant to the issues in the Avery County lawsuit, and was asked with no substantial purpose other than to embarrass

not only Dr. Lackey, but also Cheuvront." The DHC dismissed defendant Meister's complaint with a Letter of Warning, but disciplined defendant Rossabi by issuing an Admonition to·him. Defendants appeal the DHC's order.

## ANALYSIS

### I.

**[1]** Defendants first argue that the DHC improperly denied their 2 September 2005 motion for summary judgment because plaintiff failed to meet its burden of showing by clear, cogent, and convincing evidence "facts, not mere allegations, which controvert the facts set forth in the moving party's case." *Moore v. Fieldcrest Mills, Inc.*, 36 N.C. App. 350, 353, 244 S.E.2d 208, 210 (1978). It appears from the transcript that the DHC chairman denied the motion after arguments were heard on the motion during the 28 October 2005 hearing.

Plaintiff correctly notes that the denial of a motion for summary judgment is not reviewable on an appeal from final judgment after trial on the merits. "Our Supreme Court has held . . . that denial of a motion for summary judgment based on the sufficiency of the evidence is not reviewable following a trial." *Cannon v. Day*, 165 N.C. App.. 302, 305, 598 S.E.2d 207, 210 (2004). "Improper denial of a motion for summary judgment is not reversible error when the case has proceeded to trial and has been determined on the merits by the trier of the facts, either judge or jury." *Harris v. Walden*, 314 N.C. 284, 286, 333 S.E.2d 254, 256 (1985) (internal citations omitted). We therefore decline to address the question of whether the DHC improperly denied defendants' motion for summary judgment.

### II.

**[2]** Defendants next argue that evidentiary rulings throughout the 28 October 2005 proceeding were in error. Defendants' Assignment of Error 4, "Did the Disciplinary Hearing Commission err in its evidentiary rulings during the October 28, 2005 proceeding" is, as plaintiff states, super-generic. It does not comply with the requirements of Rule 10 of the North Carolina Rules of Appellate Procedure, which states that an assignment of error must direct "the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references." N.C.R. App. 10(c)(1) (2007). Accordingly, we do not review this assignment of error.

### III.

[3] Finally, defendants contend that the underlying evidence does not support the expressed findings of fact included in the DHC's order. We agree.

We first note that "[t]he standard for judicial review of attorney discipline cases is the 'whole record' test." *N.C. State Bar v. Sheffield,* 73 N.C. App. 349, 354, 326 S.E.2d 320, 323 (1985).

> This test requires the reviewing court to consider the evidence which in and of itself justifies or supports the administrative findings and . . . also [to] take into account the contradictory evidence or evidence from which conflicting inferences can be drawn. . . . Under the whole record test there must be substantial evidence to support the findings, conclusions and result. . . . The evidence is substantial if, when considered as a whole, it is such that a reasonable person might accept as adequate to support a conclusion.

*Id.* (quoting *N.C. State Bar v. DuMont,* 304 N.C. 627, 643, 286 S.E.2d 89, 98-99 (1982)) (internal quotations omitted). "Ultimately, the reviewing court must apply all the aforementioned factors in order to determine whether the decision of the lower body, e.g. [sic], the DHC, 'has a rational basis in the evidence.' " *N.C. State Bar v. Talford,* 356 N.C. 626, 632, 576 S.E.2d 305, 310 (2003) (citations omitted). Our Supreme Court has held that:

> the following steps are necessary as a means to decide if a lower body's decision has a "rational basis in the evidence": (1) Is there adequate evidence to support the order's expressed finding(s) of fact? (2) Do the order's expressed finding(s) of fact adequately support the order's subsequent conclusion(s) of law? and (3) Do the expressed findings and/or conclusions adequately support the lower body's ultimate decision?

*Talford,* 356 N.C. at 634, 576 S.E.2d at 311. Accordingly, we approach defendants' case using these steps outlined by our Supreme Court.

First, is there adequate evidence to support the order's expressed findings of fact? We hold that there is not. The relevant finding of fact in this case is finding of fact No. 12, which states, "Request number 5 of the requests for admission was not relevant to the issues in the Avery County lawsuit, and was asked with no substantial purpose other than to embarrass not only Dr. Lackey, but also Cheuvront." The DHC's determination is incorrectly stated to be a finding of fact, when

it is actually a conclusion of law. Regardless, the evidence presented does not support that conclusion.

The two parties are at a complete impasse as to how the evidence presented should be viewed. Defendants repeatedly and without waiver assert that they had a legitimate motive for asking about the nature of Cheuvront's relationship with Lackey. These assertions were made in correspondence to plaintiff, under oath while testifying, and continue in their brief. Plaintiff, on the other hand, can find no legitimate motive for this inquiry and thus concludes that the motive *could only have been* to embarrass Cheuvront and/or Lackey. The heart of the issue is whether it is conceivable that Cheuvront having a romantic relationship with Lackey is relevant to any showing of lack of justiciable claim or abuse of process, as asserted by defendants. The DHC bases its ruling on the conclusion that there is no relevant connection between the two, nor could any rational person find a relevant connection. We disagree.

It is apparent from the totality of the record that defendants believed that they had legitimate reasons for asking about Lackey's relationship with Cheuvront. Plaintiff's only evidence to the contrary is speculative testimony by Cheuvront as to defendants' purpose behind asking the question. Based on the evidence presented at the hearing, it appears that the DHC accepted plaintiff's assertion that defendants' purpose was improper, without regard to defendants' repeated claims to the contrary, simply because defendants could not produce evidence of their state of mind when the request for admission was drafted. Plaintiff presented no evidence in support of its assertion, other than Cheuvront's opinion and outrage. It appears clear from the record that defendants *did* have the intent to file an abuse of process claim prior to submitting the request for admission. In a letter from defendant Meister to Cheuvront, dated one day before the request for admission, defendant Meister wrote:

> [A]s we discussed during the mediation, you have no case against my clients. Neither case law nor the evidence supports your claims. We view this action as merely an attempt to extort money from my clients on the hope that they would rather pay you than incur legal fees fighting you. As a result, next week, we intend to file a Motion for Summary Judgment and ask for attorneys' fees under N.C. Gen. Stat. § 6-21.5. Furthermore, our clients are seriously considering a suit against your clients for abuse of process.

Plaintiff failed to meet its burden of presenting clear, cogent, and convincing evidence of defendants' improper purpose.

Determining whether Cheuvront and Lackey had a personal relationship, romantic or otherwise, would have been relevant to proving the underlying motive behind their continued litigation. Although it was ill-advised for defendants to ask Lackey about the nature of her relationship with Cheuvront in a public document such as a request for admission, the question was relevant to a lawsuit for abuse of process or lack of justiciable claim. Our Supreme Court has held that:

> abuse of process requires both an ulterior motive and an act in the use of the legal process not proper in the regular prosecution of the proceeding, and that both requirements relate to the defendant's purpose to achieve through the use of the process some end foreign to those it was designed to effect.

*Stanback v. Stanback*, 297 N.C. 181, 201, 254 S.E.2d 611, 624 (N.C. 1979) (citations and quotations omitted). Defendants have maintained for over three years that they suspected Cheuvront and Lackey to have an ulterior motive for pursuing the lawsuit: that the considerable cost of a Greensboro entity defending a claim in Avery County would lead to a generous settlement. Establishing a relationship between attorney Cheuvront and client Lackey might have explained Cheuvront's dogged pursuit of this purpose for a client who was not paying for his services, despite her ability to do so. Defendants clearly believed this to be so, and plaintiff offered no clear, cogent, and convincing evidence to the contrary.

Having found no adequate evidence to support finding of fact No. 12[1] in the DHC order, our analysis under *Talford* is complete. The DHC's decision did not have a rational basis in the evidence, and, accordingly, it is reversed.

Reversed and remanded.

Judges McGEE and BRYANT concur.

---

1. As discussed earlier, finding of fact No. 12 should have been stated as a conclusion of law.