THE NORTH CAROLINA STATE BAR, Plaintiff v. WILLIE D. GILBERT,
Attorney, Defendant

No. COA01-769

(Filed 16 July 2002)

**1. Attorneys— Disciplinary Hearing Commission—jurisdiction—violation of Industrial Commission order—attorney fees**

Even though defendant attorney contends the North Carolina State Bar Disciplinary Hearing Commission (DHC) lacked jurisdiction to decide whether defendant violated an order of the North Carolina Industrial Commission, DHC did not err by denying defendant's motion to dismiss the State Bar's claim alleging that defendant violated the Revised Rules of Professional Conduct by retaining $45,000 of the $60,000 lump settlement in his client's workers' compensation case in violation of the 14 October 1998 order of the North Carolina Industrial Commission where a deputy commissioner had only authorized defendant to receive $15,000 from the lump sum award, because the question of whether defendant violated the Commission's order does not arise under N.C.G.S. § 97-91 since defendant's alleged violation of the Commission's order authorizing attorney fees is unrelated to the issue of whether defendant's client is entitled to compensation for her husband's death.

**2. Evidence— tax records—credibility—impeachment**

The North Carolina State Bar Disciplinary Hearing Commission (DHC) did not abuse its discretion by failing to order defendant attorney's client to produce certain personal income tax records from the 1980's in order for defendant to impeach the client's credibility and to show the lengths to which the client would allegedly go to obtain money, because: (1) the client's tax records would not have been admissible under N.C.G.S. § 8C-1, Rule 608(b) since no criminal conviction resulted from the client's alleged tax fraud; and (2) the records sought do not appear reasonably calculated to lead to the discovery of admissible evidence.

**3. Evidence— wife did not know where husband buried—credibility—impeachment**

The North Carolina State Bar Disciplinary Hearing Commission (DHC) did not err by refusing to permit defendant attorney

N.C. STATE BAR v. GILBERT

[151 N.C. App. 299 (2002)]

to introduce evidence that allegedly would show defendant's client did not know where her husband was buried in an effort to impeach the client's credibility by showing that the client hid the fact that she and her husband had been estranged while defendant was pursuing the client's workers' compensation and wrongful death claims, because whether the client knew where her husband was buried was not probative of the client's credibility, nor was it relevant to any of the issues before the DHC.

**4. Attorneys— malpractice—conflict of interest—grievance not filed by clients**

The North Carolina State Bar Disciplinary Hearing Commission (DHC) did not err by failing to dismiss the State Bar's claim alleging that defendant violated Rules 1.7(b) and 8.4(g) of the Revised Rules of Professional Conduct by engaging in a conflict of interest by his representation of two of his clients even though those clients had not filed a grievance, because: (1) the State Bar is free to investigate and prosecute an attorney regardless of whether the client or other member of the public filed a grievance; and (2) the State Bar's amended complaint, which included this claim, was signed by the Chair of the State Bar's grievance committee indicating the committee's approval of the complaint.

**5. Appeal and Error— preservation of issues—failure to support with reason or legal argument**

The North Carolina State Bar Disciplinary Hearing Commission (DHC) did not err by entering an order of discipline containing what defendant attorney characterizes as erroneous and grossly misleading findings of fact, because: (1) defendant has failed to direct the Court of Appeals to those findings which he claims are not supported by evidence and has not provided an argument supporting his contentions; and (2) assignments of error which are not supported by reason or legal argument in the appellant's brief are deemed abandoned.

**6. Attorneys— malpractice—disciplinary hearing—findings of fact—conclusions of law**

The whole record test reveals that the North Carolina State Bar Disciplinary Hearing Commission (DHC) did not err by entering an order of discipline containing several conclusions of law that were allegedly not supported by findings of fact or clear, cogent, and convincing evidence, because: (1) the evidence

shows that at various times defendant gave varying explanations for retaining additional money from his client's lump sum award, and the determination of the credibility of the witness is the function of the DHC and is not subject to review on appeal; (2) there was no evidence supporting defendant's claim that he had a good faith belief that he was entitled to use a client's February annuity check to reimburse himself for costs which defendant incurred in the wrongful death case, and there was substantial evidence supporting the DHC's conclusion that defendant's failure to pay funds to his client prior to 23 February 1999 violated the Revised Rules of Professional Conduct; and (3) substantial evidence supports the DHC's findings and legal conclusion that defendant engaged in a conflict to the prejudice of his clients by charging them for three CD-ROMs which defendant retained in his law office library, without obtaining the clients' approval.

7. **Attorneys— malpractice—disciplinary hearing—aggravating factors—mitigating factors**

A review of the whole record reveals that the North Carolina State Bar Disciplinary Hearing Commission (DHC) did not err by finding the aggravating factors that defendant attorney was motivated by a dishonest or selfish motive, defendant engaged in a pattern of misconduct, defendant engaged in multiple violations of the Revised Rules of Professional Conduct, and by failing to find the mitigating factors of absence of a dishonest or selfish motive, timely good faith efforts at restitution, full and free disclosure, and remorse, because: (1) the Court of Appeals does not have authority to modify or change DHC's punishment as long as the punishment is within the limits allowed by N.C.G.S. § 84-28, and defendant was disciplined within the range authorized by the statute; (2) DHC has broad discretion in determining aggravating and mitigating factors and the appropriate weight to be given to each since these factors play a role in DHC's formulation of appropriate disciplinary measures; (3) there is ample evidence supporting all of the aggravating factors; and (4) the mitigating factors were based on defendant's credibility, and the determination of the credibility of the witnesses is the function of the DHC and will not be reviewed on appeal.

Judge Tyson concurring in part and dissenting in part.

Appeal by defendant from order entered 1 November 2000 by the North Carolina State Bar Disciplinary Hearing Commission. Heard in the Court of Appeals 18 April 2002.

*The North Carolina State Bar, by Carolin Bakewell, for plaintiff-appellee.*

*Michaux & Michaux, P.A., by Eric C. Michaux, and Willie D. Gilbert, II, pro se, for defendant-appellant.*

MARTIN, Judge.

Defendant appeals from an order of discipline issued by the Disciplinary Hearing Commission (hereinafter "DHC") of the North Carolina State Bar (hereinafter "State Bar"). In its order filed 1 November 2000, the DHC found defendant guilty of violating the following rules of the North Carolina Revised Rules of Professional Conduct: 1.5 (collecting an illegal or excessive fee); 1.7 (engaging in a conflict of interest); 8.4(b) (engaging in criminal conduct that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer); 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); 8.4(g) (intentionally prejudicing his clients); and 1.15-2(h) (failing to disburse funds as directed by client).

The DHC issued an order of discipline suspending defendant's license for five years with the last three years to be stayed provided defendant does not violate any local, state, or federal laws and does not violate any provisions of the Revised Rules of Professional Conduct or the rules and regulations of the State Bar. Prior to seeking reinstatement of his law license at the end of his two year active suspension, defendant is required to: (1) reimburse the Client Security Fund for any amounts disbursed from the Fund as a result of defendant's misconduct; (2) complete twenty hours of continuing legal education (C.L.E.) in the subjects of law office management and trust account requirements in addition to the mandatory C.L.E. requirements regularly imposed by the State Bar; and (3) pay the costs of the disciplinary proceeding.

The State Bar's evidence tended to show that in January 1997, defendant agreed to represent Celeste Pologruto in both a workers' compensation case and a wrongful death claim arising out of her husband's job-related death. Both claims were to be handled on a contingent fee basis.

N.C. STATE BAR v. GILBERT

[151 N.C. App. 299 (2002)]

On 14 October 1998, a settlement agreement was approved in the workers' compensation case. Ms. Pologruto was awarded a $60,000 lump sum payment and monthly payments of $1,455 for 60 months commencing 1 November 1998. Defendant requested the Industrial Commission to approve his retaining $45,000 in attorney's fees from the $60,000 lump sum payment. The Industrial Commission instead approved defendant's retaining $15,000 of the lump sum payment and awarded defendant every fourth monthly payment of $1,455 that Ms. Pologruto would otherwise receive.

On or about 23 October 1998, defendant received two checks in the amounts of $45,000 and $15,000, which represented the $60,000 lump sum settlement in the workers' compensation case. The $15,000 check was made payable to defendant for attorney's fees and the $45,000 check was made payable to Celeste Pologruto, in care of defendant. Defendant never sent the $45,000 check to Ms. Pologruto but instead he or a staff member endorsed her name to the check and retained it. Defendant told Ms. Pologruto that he was retaining $45,000 of the $60,000 lump sum settlement and that she would receive $15,000 and all the monthly annuity payments. Defendant testified that Ms. Pologruto had agreed to pay him the additional $30,000 above his approved fee of $15,000 in order to cover fees and expenses incurred in the pending wrongful death suit. As part of this same agreement, defendant was to forward his every fourth month check of $1,455 on to Ms. Pologruto.

Ms. Pologruto testified that defendant told her that he was retaining $45,000 of the $60,000 lump sum settlement, but he did not send her a copy of the Industrial Commission order which awarded him a lump sum fee of only $15,000 and every fourth month annuity check. According to Ms. Pologruto, defendant told her that he was going to receive all of his fees up front since that is the way it is done and explained that attorneys would never accept workers' compensation cases if they had to wait to collect their fees. Because defendant was collecting his fees up front, Ms. Pologruto testified that he told her he would forward all of the monthly checks for $1,455 to her, including those which the Industrial Commission ordered to be paid to him as a part of the fee award.

On 2 February 1999, defendant received a check for $1,455 representing the first periodic payment of attorney's fees pursuant to the settlement of Ms. Pologruto's workers' compensation claim. As stated earlier, defendant testified that he had agreed to forward every fourth check to Ms. Pologruto. Defendant deposited the check in his attor-

ney trust account and between 4 February 1999 and 23 February 1999, spent $920.22 of the $1,455 by disbursing trust account checks for personal expenses. Defendant did not obtain Ms. Pologruto's permission to use the February annuity check proceeds for his own use and benefit. Prior to 23 February, Ms. Pologruto had called defendant's office inquiring about her check for $1,455. On 23 February, defendant deposited $2,665 of his personal funds into his trust account and issued Ms. Pologruto a check for $1,455. In a letter accompanying the check, defendant communicated that he had "originally intended to deduct approximately $524" from the check for expenses related to the wrongful death suit; he did not disclose that he had actually used $920.22 for his personal expenses.

In June of 1999, after having spoken to several attorneys who advised her that, in their opinion, the monetary value of the wrongful death case was not substantial, Ms. Pologruto discharged defendant. Ms. Pologruto's wrongful death suit was ultimately dismissed with prejudice for failure to prosecute.

In 1996, defendant undertook representation of Michelle and Sanjay Munavalli (hereinafter "Munavallis") in a personal injury suit. Defendant settled the case for $65,000 in April 1998. While representing the Munavallis, defendant purchased three CD-ROMs for a total price of $4,627.43. These CD-ROMs, which were set to expire one year from the date of purchase, contained a medical encyclopedia, various forms, briefs, and statutes. Defendant testified that he needed the CD-ROMs to prosecute the Munavallis' case because he had never previously handled a personal injury suit. Defendant did not consult with the Munavallis before purchasing the CD-ROMs. On 28 April 1998, defendant sent the Munavallis an itemized statement of fees and expenses that included the full price of the CD-ROMs. The Munavallis disputed the bill but eventually paid defendant $6,800 in costs, including $4,627.43 for the CD-ROMS.

Between 13 May 1999 and 26 May 1999, defendant issued five checks from his attorney trust account totaling $260. Defendant used the cash proceeds of all five checks for his personal benefit. Due to lack of sufficient personal funds in the trust account to cover the amount of these checks, defendant used a portion of funds belonging to a client named Waller, without the client's knowledge or permission.

I.

**[1]** Defendant first contends the DHC erred in denying his motion to dismiss the first claim for relief of the State Bar's amended complaint. In its first claim for relief, the State Bar alleged that defendant violated the Revised Rules of Professional Conduct by retaining $45,000 of the $60,000 lump settlement in Ms. Pologruto's workers' compensation case in violation of the 14 October 1998 order of the North Carolina Industrial Commission, in which a deputy commissioner had only authorized defendant to receive $15,000 from the lump sum award. Defendant argues the DHC lacked jurisdiction to decide whether he violated the order. Defendant relies on G.S. § 97-91 to support his argument, which provides:

> All questions arising under this Article if not settled by agreements of the parties interested therein, with the approval of the Commission, shall be determined by the Commission . . . .

We conclude that defendant's reading of G.S. § 97-91 is overly broad. The phrase "questions arising under this Article" refers primarily to questions relating to the rights asserted by or on behalf of an injured employee or the employee's dependents. *Clark v. Ice Cream Co.*, 261 N.C. 234, 240-41, 134 S.E.2d 354, 360 (1964). Defendant's alleged violation of the Commission's order authorizing attorney's fees is unrelated to the issue of whether Ms. Pologruto is entitled to compensation for her husband's death. Moreover, our courts have not read G.S. § 97-91 to give the Commission exclusive jurisdiction over every conceivable issue that may arise from a workers' compensation case. For instance, this Court concluded that there was no statutory authority that would extend the Commission's jurisdiction to cover a dispute between the plaintiff's attorneys over the division of attorney's fees. *Eller v. J & S Truck Services, Inc.*, 100 N.C. App. 545, 397 S.E.2d 242 (1990), *disc. review denied*, 328 N.C. 271, 400 S.E.2d 451 (1991). In the instant case, whether defendant violated the Commission's order does not "arise under" the workers' compensation Article and thus, does not require determination by the Commission. Therefore, the DHC did not err in refusing to grant defendant's motion to dismiss the State Bar's first claim for relief.

II.

**[2]** Defendant also argues that the DHC erred by failing to order Ms. Pologruto to produce certain personal income tax records from the 1980s. Defendant alleges that these documents would show that Ms.

Pologruto fraudulently sought and obtained a federal tax refund. Defendant wished to use this information at the hearing to impeach Ms. Pologruto's credibility and to show the lengths to which she would go to obtain money.

Initially, we note that motions for orders compelling the production of documents are committed to the trial court's sound discretion and will not be reversed absent an abuse of discretion. *Wagoner v. Elkin City Schools' Bd. of Ed.*, 113 N.C. App. 579, 440 S.E.2d 119, *disc. review denied*, 336 N.C. 615, 447 S.E.2d 414 (1994). "An abuse of discretion occurs only when a court makes a patently arbitrary decision, manifestly unsupported by reason." *Buford v. General Motors Corp.*, 339 N.C. 396, 406, 451 S.E.2d 293, 298 (1994).

We note that Ms. Pologruto's tax records would not have been admissible under Rule 608(b) of the North Carolina Rules of Evidence. Rule 608(b) states that apart from criminal convictions governed by Rule 609, specific instances of the conduct of a witness that are introduced to attack the witness's credibility may not be proved by extrinsic evidence. Since no criminal conviction resulted from Ms. Pologruto's alleged tax fraud, no extrinsic evidence, such as her tax records, would have been admissible. Defendant would have been limited to the admissions of tax fraud that he could have gained from Ms. Pologruto on cross-examination. Since Ms. Pologruto's tax records would have been inadmissible for impeachment purposes and the records sought do not appear reasonably calculated to lead to the discovery of admissible evidence, the DHC did not abuse its discretion by denying defendant's motion to compel. *See* N.C. Gen. Stat. § 1A-1, Rule 26(b)(1) (2001).

III.

[3] Defendant argues that the DHC erred by refusing to permit him to introduce evidence that, according to defendant, would show that Ms. Pologruto did not know where her husband was buried. Defendant contends that excluding this evidence denied him an opportunity to impeach Ms. Pologruto's credibility by showing that she hid the fact that she and her husband had been estranged while defendant was pursuing her workers' compensation and wrongful death claims.

Evidence is admissible if it is relevant and its probative value is not substantially outweighed by, among other things, the danger of unfair prejudice. N.C. Gen. Stat. § 8C-1, Rules 402 and 403 (2001). Relevant evidence is defined as:

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

N.C. Gen. Stat. § 8C-1, Rule 401 (2001). Trial tribunals' rulings regarding the admission or exclusion of evidence based on relevancy are given great deference by our appellate courts. *State v. Mitchell*, 135 N.C. App. 617, 522 S.E.2d 94 (1999).

With that standard in mind, we review defendant's contentions and conclude that whether Ms. Pologruto knew where her husband was buried was not probative of her credibility, nor was it relevant to any of the issues before the DHC. Therefore, we hold that the DHC properly excluded the evidence concerning whether Ms. Pologruto knew where her husband was buried.

IV.

**[4]** Defendant next contends that the DHC erred by failing to dismiss the third claim for relief contained in the State Bar's amended complaint, in which the State Bar alleged that defendant had engaged in a conflict of interest in violation of Rules 1.7(b) and 8.4(g) of the Revised Rules of Professional Conduct during the course of representing Michelle and Sanjay Munavalli. Defendant asserts that the filing of a complaint concerning his representation of the Munavallis could not have been properly authorized by the grievance committee of the State Bar since the Munavallis had not filed a grievance. Therefore, according to defendant, the DHC had no authority to hear the matters contained in the third claim for relief.

Our Supreme Court has held that the State Bar is free to investigate and prosecute an attorney regardless of whether the client or other member of the public files a grievance. *State Bar v. Frazier*, 269 N.C. 625, 153 S.E.2d 367, *cert. denied*, 389 U.S. 826, 19 L. Ed. 2d 81 (1967). Thus, the fact that neither the Munavallis nor anyone else on behalf of the Munavallis filed a grievance with the grievance committee does not prohibit the State Bar from filing a claim against defendant relating to his representation of the Munavallis. Moreover, the State Bar's amended complaint, which included the third claim for relief, was signed by the Chair of the State Bar's grievance committee indicating the committee's approval of the complaint. Therefore, we conclude that the DHC did not err in refusing to dismiss the third claim for relief of the State Bar's amended complaint.

V.

**[5]** Defendant asserts that the DHC erred by entering an order of discipline containing what he characterizes as erroneous and grossly misleading findings of fact. However, defendant has failed to direct us to those findings which he claims are not supported by evidence and has not provided an argument supporting his contentions. Assignments of error which are not supported by reason or legal argument in the appellant's brief are deemed abandoned. N.C.R. App. P. 28(b)(6) [formerly N.C.R. App. P. 28(b)(5)]; *Talley v. Talley*, 133 N.C. App. 87, 513 S.E.2d 838, *disc. review denied*, 350 N.C. 599, 537 S.E.2d 495 (1999). Therefore, this issue is deemed abandoned.

VI.

**[6]** Defendant argues that the DHC erred by entering an order of discipline containing several conclusions of law that are not supported by the findings of fact or by clear, cogent and convincing evidence.

The whole record test is the appropriate standard for judicial review of a disciplinary hearing. *State Bar v. Frazier*, 62 N.C. App. 172, 302 S.E.2d 648, *disc. review denied*, 308 N.C. 677, 303 S.E.2d 546 (1983). In applying this standard, the reviewing court is required to consider the evidence which supports the administrative findings and must also take into account contradictory evidence. *N.C. State Bar v. DuMont*, 304 N.C. 627, 286 S.E.2d 89 (1982). Under the whole record test, the DHC's ruling should be affirmed if the findings, conclusions, and result are supported by substantial evidence. *Id.* at 643, 286 S.E.2d at 98-99. "The evidence is substantial if, when considered as a whole, it is such that a reasonable person might accept as adequate to support a conclusion." *Id.*

A.

Defendant specifically argues that the DHC erred in concluding that defendant violated the Revised Rules of Professional Conduct by retaining $45,000 of the $60,000 lump sum settlement in the Pologruto workers' compensation case. Defendant argues that the Industrial Commission's order was satisfied since it only required the insurance carrier to deliver the $45,000 check for Ms. Pologruto to defendant which was done. This argument is meritless. It is clear that the intent of the order was to award $45,000 of the $60,000 lump sum settlement to Ms. Pologruto. Thus, under the order, defendant was required to ensure that Ms. Pologruto received the $45,000. Additionally, Deputy

Commissioner Hoag indicated that defendant had in fact violated her order.

Defendant also contends that he did not violate the Industrial Commission's order because only $15,000 of the $45,000 that he retained represented his fee for the workers' compensation case, which had been approved by the Commission. Defendant claims that the remaining $30,000 constituted his fee in the wrongful death case he was handling for Ms. Pologruto. However, Ms. Pologruto testified that she never agreed to allow defendant to retain $30,000 from her lump sum award as a fee in the wrongful death case. Additionally, defendant testified that he had originally agreed to handle the wrongful death case on a contingent fee basis in early 1997. The evidence showed that defendant did not obtain any recovery in the wrongful death case, therefore under a contingent fee agreement, he was not entitled to a fee. Defendant did not produce any written agreement modifying the original contingent fee agreement and authorizing him to retain $30,000 of the workers' compensation award as a fee in the wrongful death case. The evidence shows that, at various times, defendant gave varying explanations for retaining the additional $30,000 from Ms. Pologruto's lump sum award. The determination of the credibility of the witnesses is the function of the DHC and is not subject to review on appeal. *N.C. State Bar v. Sheffield,* 73 N.C. App. 349, 326 S.E.2d 320, *cert. denied,* 314 N.C. 117, 332 S.E.2d 482, *cert. denied,* 474 U.S. 981, 88 L. Ed. 2d 338 (1985).

Defendant also contends the DHC erred in concluding that he acted dishonestly in retaining $30,000 of Ms. Pologruto's workers' compensation award since he testified that he planned to reimburse Ms. Pologruto $21,825 over 60 months and allow her a credit of $8,125 toward his fee in the wrongful death case. His testimony with respect to his intentions, however, is also subject to the DHC's determination of his credibility, which we will not review.

B.

Defendant also takes issue with the DHC's conclusion of law that defendant violated the Revised Rules of Professional Conduct by temporarily misappropriating a portion of the $1,455 February 1999 annuity payment without Ms. Pologruto's knowledge or consent. Defendant first contends that the February 1999 annuity check was his property and therefore, he could not have misappropriated his own money. However, defendant conceded at the hearing that he had agreed to forward all of the annuity checks to Ms. Pologruto.

Additionally, Ms. Pologruto testified that defendant told her that he would forward the fourth month annuity checks, which were supposed to go to defendant under the structured settlement, to her since he was collecting his fees up front. Therefore, there is substantial evidence supporting the DHC's finding that the proceeds of the $1,455 February annuity check were the property of Ms. Pologruto.

Defendant also argues that even if the February check for $1,455 was the property of Ms. Pologruto, she was not entitled to receive the check on a particular date and therefore he did not violate the Revised Rules of Professional Conduct because he sent her a replacement check for $1,455 on 23 February 1999. However, defendant used the funds between 4 February 1999 and 23 February 1999 without Ms. Pologruto's consent.

Defendant further argues that he had a good faith belief that he was entitled to use the February annuity check to reimburse himself for costs which he incurred in the wrongful death case and therefore, he asserts that his failure to pay the funds to Ms. Pologruto prior to 23 February 1999 was not a dishonest, deceitful or fraudulent act, nor was it a criminal act. However, there is no evidence that defendant in good faith believed he was entitled to use the February check for expenses associated with the wrongful death suit. First, no written agreement existed to that effect. Second, defendant never submitted any itemized bill of alleged expenses to Ms. Pologruto before appropriating $920.20 of the check. This conduct violated defendant's own office policy that clients be billed before being asked to pay reimbursements. Finally, even though defendant claimed the entire $920.20 was for reimbursement of his expenses related to the wrongful death suit, his 23 February letter to Ms. Pologruto stated that, as of the date of the letter, he had only incurred $524 in expenses. There was no evidence supporting defendant's claim that he had a good faith belief that he was entitled to use the February annuity check to reimburse himself for costs which he incurred in the wrongful death case, and we conclude that there was substantial evidence supporting the DHC's conclusion that defendant's failure to pay the funds to Ms. Pologruto prior to 23 February 1999 violated the Revised Rules of Professional Conduct.

C.

Defendant contends the DHC erred by concluding that he had engaged in a conflict of interest and had prejudiced the Munavallis by charging them $4,627.43 for three CD-ROMs, which he retained in his

law office library, without first obtaining his clients' approval for the expense. The CD-ROMs contained a medical encyclopedia, various forms, and sample legal briefs and citations. The DHC found that defendant had not obtained the Munavallis' consent prior to his purchasing the CD-ROMS, which he contended were necessary because he had never previously handled a personal injury case. At the conclusion of the matter, defendant sought to charge the Munavallis, by way of an itemized statement of costs and expenses, for the full cost of the CD-ROMs in addition to the contingent fee which they had originally agreed to pay. Though the DHC found that defendant's fee contract with the Munavallis did not provide for their payment for such things as the CD-ROMS, defendant argues to this Court that the Munavallis "freely and voluntarily" agreed to pay for the CD-ROMs as a part of a "global settlement" of the fees for their case. Therefore, according to defendant, the Munavallis' payment for the CD-ROMs was the result of an arms-length agreement and thus beyond the scope of the DHC's regulatory power. We disagree with defendant that the Munavallis' payment for the CD-ROMs was the result of an arms-length transaction. Attorneys owe a fiduciary duty to their clients and attorney-client negotiations are closely scrutinized. Our courts have applied the following rule to fee contracts, both fixed and contingent:

> a contract made between an attorney and his client, during the existence of the relationship, concerning the fee to be charged for the attorney's services, will be upheld if, but only if, it is shown to be reasonable and to have been fairly and freely made, *with full knowledge by the client of its effect and of all the material circumstances relating to the reasonableness of the fee.* The burden of proof is upon the attorney to show the reasonableness and the fairness of the contract, not upon the client to show the contrary (emphasis added).

*Randolph v. Schuyler*, 284 N.C. 496, 504, 201 S.E.2d 833, 837-38 (1974). Such close scrutiny is applied to attorney-client negotiations since "[c]lients are very vulnerable to lawyer over-reaching because of their trust in their lawyers and because of their lawyers' superior knowledge and skills." Charles W. Wolfram, *Modern Legal Ethics*, § 8.11.3, at 481-82 (1986).

The evidence showed that at the outset of defendant's representation, the Munavallis agreed to pay, in addition to a contingent fee, for certain costs of litigation such as photocopies and computer

research, but the agreement did not extend to basic reference materials, such as books, statutes and encyclopedias which might reasonably be expected to be contained in an attorney's library or other library accessible to the attorney. After the attorney-client relationship was formed, and without prior disclosure or approval, defendant sought to charge the Munavallis for the entire cost of the CD-ROMs. Defendant made no showing that these materials were reasonably required for the successful resolution of the Munavallis' case. Moreover, there was no showing that it was reasonable and fair for the Munavallis to bear the entire cost of the materials which were available for defendant's use in representing other clients in personal injury cases. Though the Munavallis ultimately agreed to settle the fee and cost dispute by paying an amount which included the cost of the CD-ROMS, well after the fact of purchase, they were not, even then, made aware that the amount which they had agreed to pay included $1,751.65 in charges for on-line research incurred for other clients.

Though the conduct is related to fees, the conduct for which defendant was disciplined was not the fee dispute with the Munavallis, which would have been a proper subject for resolution through the procedures contained in Subchapter D, Section .0700 of the Rules and Regulations of the North Carolina State Bar. *See* 27 NCAC 1D.0700 *et seq.* Rather, the conduct for which defendant was disciplined related to his breach of the fiduciary duty of full disclosure to, and fair dealing with, his clients by failing to disclose material facts to them resulting in a benefit to himself at his clients' expense. Indeed, the evidence showed that though defendant collected the cost of the CD-ROMs and on-line research from the Munavallis, he diverted those funds to his personal expenses and had not, as of the time of the hearing, paid for either the CD-ROMs or the computer research.

Substantial evidence in the whole record supports the findings of the DHC, which, in turn, support its legal conclusion that defendant engaged in a conflict to the prejudice of the Munavallis by charging them $4,627.43 for three CD-ROMs which he retained in his law office library, without first obtaining the clients' approval.

VII.

[7] Defendant finally argues that the DHC erred by finding certain aggravating factors and failing to find certain mitigating factors. Defendant specifically argues that the DHC erred in finding the fol-

lowing aggravating factors: defendant was motivated by a dishonest or selfish motive; defendant engaged in a pattern of misconduct; and defendant engaged in multiple violations of the Revised Rules of Professional Conduct. Additionally, defendant contends the DHC erred in failing to find the following mitigating factors: absence of a dishonest or selfish motive; timely good faith efforts at restitution; full and free disclosure; and remorse.

This Court has previously stated that "so long as the punishment imposed is within the limits allowed by [G.S. § 84-28] this Court does not have the authority to modify or change it." *N.C. State Bar v. Wilson*, 74 N.C. App. 777, 784, 330 S.E.2d 280, 284 (1985). Therefore, since mitigating and aggravating factors play a role in the DHC's formulation of appropriate disciplinary measures, the DHC has broad discretion in determining aggravating and mitigating factors and the appropriate weight of each. In the instant case, defendant was suspended for five years with the last three years of the suspension stayed under certain terms and conditions. This discipline falls within the range authorized by statute. *See* N.C. Gen. Stat. § 84-28(b)(2), (c)(2) (2001). Moreover, a review of the whole record shows that there is ample evidence supporting all of the aggravating factors.

Likewise, we conclude the DHC did not err in failing to find the mitigating factors contended for by defendant. The mitigating factors for which defendant argues are all partly, if not wholly, based on defendant's credibility, i.e., whether he had a dishonest or selfish motive; whether he had made timely good faith efforts at restitution; whether he had been forthcoming; and whether he was truly remorseful. As stated earlier, the determination of the credibility of the witnesses is the function of the DHC and will not be reviewed on appeal. *Sheffield*, 73 N.C. App. 349, 326 S.E.2d 320. Therefore, we conclude that the DHC did not err in failing to find these particular mitigating factors.

The order of discipline is affirmed.

Affirmed.

Judge THOMAS concurs.

Judge TYSON concurs in part and dissents in part.

TYSON, Judge, concurring in part and dissenting in part.

I concur with parts I, II, III, IV, V, and VII of the majority's opinion. I respectfully dissent from part VI for two reasons: (1) the Disciplinary Hearing Commission's ("DHC") conclusions are inconsistent regarding simultaneous violations of the Industrial Commission's order, and (2) the DHC's findings of fact and conclusions of law regarding defendant's use of CD-ROMs are not supported by the evidence.

The practice of law is a property right requiring due process of law before it may be impaired. *In re Burton*, 257 N.C. 534, 126 S.E.2d 581 (1962); *Sonek v. Sonek*, 105 N.C. App. 247, 255, 412 S.E.2d 917, 922 (1992); *North Carolina State Bar v. DuMont*, 52 N.C. App. 1, 15, 277 S.E.2d 827, 836 (1981); *In re Bonding Co.*, 16 N.C. App. 272, 192 S.E.2d 33 (1972).

### I. Pologruto Fee Agreement

The DHC order concluded that defendant violated the Revised Rules of Professional Conduct ("Rules") "[b]y retaining $30,000 of the $60,000 lump settlement in the Pologruto case for his own use and benefit . . . . [and by failing] to disburse funds as directed by the client."

The DHC's conclusions are inconsistent. The DHC could not have logically and simultaneously concluded that defendant violated both of the above. On 14 October 1998, the Industrial Commission issued an order awarding defendant $15,000 of the lump sum award of $60,000. The remaining $45,000 was issued for Pologruto's care of defendant. The order also provided that defendant would receive every fourth monthly annuity check in the amount of $1,455 as an additional attorney fee for sixty months.

Presuming that defendant violated the Industrial Commission's order by retaining the $30,000 and that defendant wrongfully entered into an agreement with Pologruto whereby defendant would forgo every fourth check and give all annuity checks to Pologruto, it was error for the DHC to also conclude that defendant violated the Rules by failing to disburse the February 1999 annuity check as directed by Pologruto.

The only basis for Pologruto to lay claim to the fourth check that belonged to defendant pursuant to the Industrial Commission's order was for Pologruto to have agreed for defendant to retain the $30,000.

DHC cannot find that it was a violation of the Rules for defendant to retain $30,000 and also subject him to discipline for failing to deliver the fourth check.

As the majority opinion correctly states, the February annuity check was a "fourth" check. The Industrial Commission's order expressly provided that every fourth check belonged to defendant. Defendant's retention of the fourth check was pursuant to the Industrial Commission's order. Defendant cannot logically be disciplined for retaining the $30,000 check in violation of the Industrial Commission's order, entering a wrongful agreement to disburse every fourth check in violation of the Industrial Commission's order, and then be disciplined for retaining every fourth check pursuant to the Industrial Commission's order. I would vacate this portion of the DHC's order and remand.

The majority's opinion upholds the DHC's conclusion that defendant wrongfully retained the $30,000. Nothing prevents an attorney and client from entering into a new fee arrangement for another case after the Industrial Commission's case is concluded. The better practice would have been for defendant to disburse $45,000 to Pologruto and have her write him a check for $30,000, if such a retainer fee agreement was reached pursuant to another matter.

Furthermore, presuming that defendant and Pologruto entered into an agreement for defendant to disburse his fourth check to her, a nineteen day delay, standing alone, is insufficient to support the DHC's conclusion that defendant "failed to disburse funds as directed by the client." I concur with that portion of the majority's opinion that defendant "misappropriated a portion of the $1,455 February check" by using those trust funds for personal and or business purposes.

## II. Munavallis' Computer Research Agreement

I disagree with the majority's characterization that defendant was not disciplined for a fee dispute, but for conduct "related to his breach of fiduciary duty of full disclosure to, and fair dealing with, his clients by failing to disclose material facts to them resulting in a benefit to himself at his clients' expense."

The DHC's order concluded that:

By charging the Munavallis for three CD-ROMs which he retained in his law office library, without first obtaining his clients' approval for the expense, Gilbert engaged in a conflict of interest

in violation of Rule 1.7(b) and prejudiced his clients, in violation of Rule 8.4(g). . . .

Defendant represented Munavallis in a medical malpractice case in which defendant obtained a settlement of $65,000. Defendant's agreement was a twenty-eight (28) percent contingency, based upon recovery, with Munavallis remaining responsible for costs and "computer research." The uncontested evidence at the hearing showed that defendant normally charged a contingent fee of thirty-three and a third (33⅓) percent of recovery. Defendant reduced his normal contingent fee upon Munavallis' request.

The DHC's order found as fact that:

27. Gilbert testified that he needed the CD-ROMs to prosecute the Munavallis case, as he had never handled a personal injury action prior to undertaking the Munavallis' matter.

. . . .

29. Gilbert did not consult with the Munavallis before incurring the $4,627.43 expense for the CD-ROMs.

30. The fee contract which Gilbert entered into with the Munavallis did not state that the Munavallis would be responsible for the cost of purchasing CD-ROMs.

31. Although the Munavallis disputed the amount of the bill which Gilbert sent to them on April 20, 1998, they ultimately paid to him $6,800 in costs, which included the full price of the CD-ROMs.

The undisputed evidence at the hearing showed that: (1) defendant had not previously represented a client with a medical malpractice claim, (2) defendant needed to become competent in medical malpractice litigation in order to properly represent Munavallis, (3) defendant purchased CD-ROMs to aid in his representation of Munavallis, (4) the CD-ROMs purchased and used by defendant were solely for Munavallis's case, (5) the CD-ROMs were consumables that expired in one year, (6) Munavallis agreed to be responsible for costs associated with computer research, (7) Munavallis knew that defendant used Westlaw research, (8) Munavallis did not know how much Westlaw research defendant would perform, and she did not authorize each use, (9) no evidence existed that defendant used the CD-ROMs for any work other than for Munavallis' medical malpractice case, (10) initially Munavallis complained to defendant about the

amount of the "costs" defendant had billed her, (11) defendant and Munavallis reached a subsequent agreement regarding the proper amount of costs, (12) Munavallis testified that she was satisfied with the agreement that she reached with defendant, (13) Munavallis did not complain to the North Carolina State Bar about her bill for costs and expenses, and (14) there is no evidence that defendant bene-fitted himself at the expense of Munavallis.

I would hold that the written agreement, which expressly pro-vided for "computerized research," between defendant and Munavallis sufficiently informed Munavallis about the CD-ROM research, and that there was no evidence presented at the hearing that showed that defendant did not use the CD-ROMs on Munavallis' case or that he used them on other client's cases to benefit himself. Any dispute over the proper amount of costs, although not contested by Munavallis now, is better suited for resolution through the proce-dures set forth in Subchapter D, Section .0700 of the Rules. NCAC 1 D.0700 *et seq.* If any wrongdoing had been disclosed during arbitra-tion, it could have been a basis for an order of discipline. I would vacate the order of the DHC and remand for a redetermination of dis-cipline. I concur in part and respectfully dissent in part.